# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### March 18, 2008 Session

## STATE OF TENNESSEE v. PERRY A. MARCH

### Appeal from the Criminal Court for Davidson County
No. 99-B-1290    Steve Dozier, Judge

---

### No. M2006-02732-CCA-R3-CD - Filed July 15, 2008

---

The defendant, Perry A. March, appeals his jury-imposed, Davidson County Criminal Court theft conviction and his five-year sentence. In his appeal, the defendant claims that the convicting evidence was insufficient because of a variance between the indictment and the proof, that the trial court erred in denying his objection to the use of pattern jury instructions for theft, and that the court erred in enhancing his sentence. Claiming that the trial court did not enter an order to address the defendant's timely motion for new trial, the State seeks dismissal of the appeal. We reject the State's claim for dismissal, and because the proof supported the claim of theft, we affirm the conviction; however, we modify the sentence to three years.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed as Modified**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., joined. JOSEPH M. TIPTON, P.J., filed a concurring opinion.

C. Edward Fowlkes and Michael J. Flanagan, Nashville, Tennessee, for the appellant, Perry A. March.

Robert E. Cooper, Jr., Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Amy Eisenbeck and Benjamin Winters, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Appellate Jurisdiction

Before addressing the defendant's appeal on the merits, we must address the State's claim that, because the trial court did not enter an order overruling the motion for new trial, we are without jurisdiction to hear the appeal.

A Davidson County grand jury indicted the defendant for a 1996 theft of currency valued at $10,000 or more but less than $60,000, a Class C felony. Following a jury trial and a verdict of guilty, the trial court entered judgment, including a five-year, Department of Correction sentence, on September 6, 2006. The defendant filed a motion for new trial on October 5, 2006. As evidenced by a minute entry contained in the appellate record, the trial court overruled the motion on November 9, 2006. The defendant filed his notice of appeal on December 7, 2006. On November 6, 2007, the State moved this court to dismiss the appeal because the record contained no order overruling the motion for new trial. In response, the defendant filed in the trial court a "Motion for Entry of Court Order denying Defendant's Motion for New Trial and Motion for Judgment of Acquittal." On November 16, 2007, the trial court entered an order denying this motion, commenting that it lacked jurisdiction because the notice of appeal had been filed and that Tennessee Rule of Criminal Procedure 33(c)(3) "does not require a written order to be filed." On November 28, 2007, this court found that the defendant was taking steps in the trial court to rectify the absence of a written order denying the motion for new trial, and we denied the State's motion to dismiss the appeal. Nevertheless, the State persisted in its bid to have the appeal dismissed, apparently in response to the trial court's November 16, 2007 order. On January 7, 2008, this court, via a one-judge order, deemed the trial court's November 16, 2007 order as an order overruling the motion for a new trial and denied the motion to dismiss. Still, the State persists in its claim that this court lacks jurisdiction to hear the appeal.

This battle over the trial court's disposition of the motion for new trial is perplexing. We suspect that the defendant first prompted the debate when he claimed in his November 14, 2007 motion in the trial court that the court should "enter an order on the record stating the Court's findings of fact and conclusions of law to explain its denial of Defendant's Motion for New Trial." *See* Tenn. R. Crim. P. 33(c)(3) (stating that, "on motion by either party," the trial court shall "make and state in the record findings of fact and conclusions of law to explain its ruling" on the motion for new trial). Apparently, the trial judge perceived that the motion targeted a failure to enter any order at all and stated in his November 16, 2007 order that Rule 33 "does not require a written order to be filed." We can only surmise that the parties thereafter assumed that no order had been filed.

Such is not the case, however. The trial court, through its minutes, actually entered an order on November 9, 2006, denying the motion for new trial.[1] The minute entry contained in the appellate record is effective to overrule the motion for new trial. *See Mullen v. State*, 51 S.W.2d 497, 498, 164 Tenn. 523, 528 (1932) ("[C]ourts speak only through their minutes. . ."); *Dyer v. State*, 79 Tenn. 509, 514 (1883) (stating that court minutes "import absolute verity"); *see also* T.C.A. § 16-1-106(a) (1994) (providing for "minutes of the court for each day's work"). "[M]inute entries or judgment orders . . . , or certified copies thereof" are "principal records" establishing a court's actions through its orders. *See State v. Woodall*, 729 S.W.2d 91, 93 (Tenn. 1987).

Having established that the trial court did, in fact, deny the motion for new trial, we take pains to emphasize (1) that a premature notice of appeal, had there been such in the present case,

---

[1]The notice of appeal was timely filed thereafter.

would not affect the trial court's jurisdiction over a pending motion for new trial and (2) that the trial court must enter an order overruling such a motion.

The timely filing of a motion for new trial tolls the time for filing a notice of appeal after a judgment has been entered, *see* Tenn. R. App. P. 4(c) (providing that the time for appeal runs "from the entry of an order denying a new trial"), and it results in the trial court's continued jurisdiction over the case, *see id.* 4(e) ("The trial court retains jurisdiction over the case pending the court's ruling on any timely filed motion specified in subparagraph . . . (c) of this rule."). "A notice of appeal filed prior to the trial court's ruling on a timely [motion for new trial] shall be deemed to be premature and shall be treated as filed after the entry of the order disposing of the motion and on the day thereof." *Id.* Thus, a trial court does not lose – nor does the appellate court acquire – jurisdiction because the defendant filed his notice of appeal before an order overruling the motion for new trial was entered.

That said, the failure of a trial court to enter any order overruling the motion for new trial would leave the case pending in the trial court. This court's jurisdiction is limited to the appellate review of "*final* judgments of trial courts in . . . [c]riminal cases, both felony and misdemeanor." T.C.A. § 16-5-108(a) (1994) (emphasis added). We recognize that Tennessee Rule of Criminal Procedure 33, which addresses the filing and hearing of motions for new trial in criminal cases, does not by its terms require the trial court to enter a written order disposing of the motion for new trial. *See* Tenn. R. Crim. P. 33(c)(3) ("In ruling on the motion for a new trial, the court – on motion by either party – shall make and state in the record findings of fact and conclusions of law to explain its ruling on any issue not determined by the jury."). Neither that subsection's mention of findings of fact and conclusions of law nor any other provision in the criminal procedure rules, however, contradicts the provisions of Tennessee Rule of Appellate Procedure 4(c), which keys the time for filing the appeal to the "*entry* of the order denying a new trial." Tenn. R. App. P. 4(c) (emphasis added). Thus, although no written findings of fact are required, the trial court must rule on the motion and enter an order to start the clock for any appellate proceedings.

In view of the foregoing, we hold that this court has jurisdiction to hear the appeal.

## II. Background; Trial Evidence

At trial, the State opened its case-in-chief with the testimony of Tom Jacobs, a Certified Public Accountant (CPA). Mr. Jacobs testified that he served as CPA for the law firm of Levine, Mattson, Orr & Geracioti (LMOG), the firm with which the defendant, an attorney, was associated. He testified that, on August 15, 1996, the defendant told him that the defendant planned to open his own law firm and that, for his start-up capital, he had been "holding back some billings from current clients of the firm." At the time, Mr. Jacobs thought that the defendant had effected an arrangement with LMOG permitting him to do this because Larry Levine, a partner in LMOG, was the defendant's father-in-law. Mr. Jacobs testified that he did not reveal his August 15, 1996 meeting with the defendant to LMOG until October 18, 1999, when he was contacted by Larry Levine.

Gerry Zeitlin testified that he engaged the defendant to be his attorney in various legal affairs in May 1996. Mr. Zeitlin testified that he had agreed to pay the defendant by the hour for legal services and that he had inquired on several occasions about the amount of the accrued bill. When Mr. Zeitlin asked the defendant in a meeting on August 8, 1996, about Mr. Zeitlin's having received no billing, the defendant informed him that he had accrued 13 to 16 hours, adding that Mr. Zeitlin should not "worry about it." Mr. Zeitlin testified that the defendant informed him that he would be leaving LMOG and that Mr. Zeitlin would be the first client of his new firm. He testified that the defendant said that he was considering buying a floor of the "Saturn Building" for office space. The building was adjacent to the LMOG offices. On September 5, 1996, Mr. Zeitlin requested that LMOG send his files to a new attorney, and the firm complied. Mr. Zeitlin ultimately received a bill from LMOG in the approximate amount of $3,000, which he declined to pay because he had to hire a new attorney to duplicate the services performed by the defendant.

William Gambill testified that, beginning in 1995, the defendant served as his attorney through LMOG. He testified that he had received and paid billings from LMOG. When he asked the defendant about a May 15, 1996 billing from LMOG that he thought was "a little higher" than it should have been, the defendant told him, "[D]on't worry about it, that [the defendant] was going into practice next door and that we'd work it out." Mr. Gambill testified that the defendant told him that, when the defendant opened his new firm, Mr. Gambill could pay the defendant, not LMOG, for accrued billings. Mr. Gambill testified that some of the legal work reflected on the May 15, 1996 billing had been performed by attorneys in LMOG other than the defendant. Still, Mr. Gambill assumed that the defendant's appropriating Mr. Gambill's account with LMOG might be "a gratuity from his daddy-in-law." Mr. Gambill testified that, although he had paid several of LMOG's previous billings in full, he compromised and settled the final bill for approximately 50 percent of the amount of the bill. He agreed that the attorney fees for which he had been billed were owed to LMOG.

Attorney John Wood testified that he worked for LMOG from October 1994 until late 1997. He testified that LMOG used a "split-fee" system. When a lawyer in the firm brought in a client, the fee generated by work for that client would be split equally between the lawyer and the firm. When, in such a situation, the client delivered a check payable to the lawyer, the lawyer would turn the check over to the firm's office manager, and the lawyer would receive his or her 50-percent split later. Mr. Wood testified that, when he left LMOG and anticipated taking with him some cases that were being handled on a contingency fee basis, he entered into an agreement with LMOG for splitting any fee that would be subsequently paid. Mr. Wood testified that for hourly-rate legal services, LMOG would record the hours and periodically bill the client.

Mr. Wood testified that during his tenure at LMOG he knew the defendant, who in early 1996 asked Mr. Wood to lunch with him. During lunch, the defendant revealed his interest in opening his own law office and his desire to have Mr. Wood go with him. The subject was not mentioned again between the two men until August 1996, when the defendant again solicited Mr. Wood to leave LMOG and enter a new practice with the defendant. Mr. Wood testified that the defendant claimed that Larry Levine "would never come after him for any outstanding legal fees

-4-

owed to [LMOG] under the split system, because [the defendant] was married to his daughter and that he was the provider for Larry's grandchildren." Mr. Wood testified that the defendant said that his "six biggest clients" were "enthusiastic" about the defendant opening a new firm. "He said something to [the] effect," testified Mr. Wood, "that he was going to ask his clients to hold off paying their bills, until he had started his new law firm." A few days following this discussion, Mr. Wood told the defendant that he was not interested in going to a new firm with him.

Attorney Peter Rosen testified that he had been with LMOG since 1993 and had since become a partner. Earlier, when he was an associate of the firm, the firm split fees evenly with an associate on files generated by the associate. The associate would receive his or her 50-percent split from the firm after the fee was paid to the firm.

Mr. Rosen testified that when a lawyer in the firm performed hourly-rate work for a client, the lawyer's secretary would record the time on a time sheet, and when the lawyer was "ready to bill the file," he or she would direct the issuance of a statement to the client. The lawyer had control over when the hourly accrued services were billed. When "the money comes in," Mr. Rosen testified, "it's the firm's money." Should the client remit payment to the individual lawyer, the lawyer "would have to endorse it and give it to the firm."

Mr. Rosen testified that on August 13, 1996, the defendant told him that he was going to leave LMOG. The defendant asked Mr. Rosen to join him in forming a new firm which, the defendant hoped, would be "the Jewish law firm of Nashville." Mr. Rosen testified that the defendant planned to start the new firm "with money from the clients he was working for at that time, because a number of them had agreed to pay money to him – pay the attorneys' fees, that were already worked for but not paid yet, to him after he started at his new firm." A few days later, Mr. Rosen told the defendant that he was not interested in leaving LMOG.

Elliot Greenberg, the president of Tennessee Mat Company, testified that he developed a close friendship with the defendant in the 1980's. In 1994, when Mr. Greenberg began to pursue an interest in buying Tennessee Mat, his father's company, he engaged the defendant to serve as his attorney. He knew at the time that the defendant was associated with LMOG. Mr. Greenberg testified that, throughout the business-acquisition process, "there was no interim billing." "We just sort of understood," he testified, "that there would be a time . . . to start paying him for some of the work that he'd done."

In September or October 1996, when the defendant was in the process of leaving LMOG, he told Mr. Greenberg that the accrued fee was $20,000. Mr. Greenberg had received no billing or other communication from LMOG, and he paid the defendant with two checks, one for $5,000 on October 8, 1996, and a second on October 22, 1996, in the amount of $15,000. Both checks were made payable, upon the defendant's instructions, to the defendant and were in satisfaction of the defendant's claim for legal services rendered "during the whole time that we've been talking about here."

Mr. Greenberg testified that between October 8 and 22, 1996, he received a communication from LMOG notifying him that the defendant had left the firm and that payments for the defendant's legal services should be remitted to LMOG. Upon receiving the LMOG letter, Mr. Greenberg contacted the defendant, who told him to disregard the letter. He testified that the defendant said, "You're not gonna [sic] get in any trouble over it. But, you know, I did the legal work for you and the check should be made out to me." Mr. Greenberg testified, "[T]his was a guy I trusted . . . all those years, and a guy that I was incredibly close friends with; and I didn't question that explanation." He dismissed the LMOG letter as "just sort of a typical letter a law firm would send out."

Mr. Greenberg acknowledged that he wrote "legal services prepayment" on the memorandum line of the October 22, 1996, $15,000 check that was issued after he received the letter from LMOG and after his follow-up conversation with the defendant. He testified that his notation complied with the defendant's instruction. Mr. Greenberg testified, "[I]t didn't even occur to me to question it." Mr. Greenberg testified that he thought at the time his attorney's advice to word the check memorandum that way was designed to protect the interests of Mr. Greenberg, the client, and he only realized later that the advice was designed to protect the defendant's interests. Nevertheless, he testified that the payment "wasn't for services yet to come; it was really . . . for services that . . . he had already done for me" in the previous two years. Mr. Greenberg testified that both checks were cashed.

Mr. Greenberg testified that he received a second letter from LMOG in early November 1996. On the bottom of the letter, he wrote a note memorializing his follow-up conversation with Mike Geracioti, a partner in LMOG. The note reflected that Mr. Greenberg told Mr. Geracioti that his file had been handled on a "contingency-success basis." Mr. Greenberg testified that the defendant had instructed him to respond to LMOG in this manner. In reality, he testified, he had always understood that he would pay the defendant a reasonable fee, a "fair amount."

Eventually, LMOG sent Mr. Greenberg a letter stating that he owed the firm approximately $22,000 for the work that the defendant had performed for him. After Mr. Greenberg rejected LMOG's demand for payment, LMOG sued him. Mr. Greenberg testified that he wrote Larry Levine a personal letter in which he offered to pay the sum of $20,000 to LMOG. In a subsequent jury-out hearing in which the trial court was apparently orchestrating the parties's review of the file of the attorney who represented Mr. Greenberg in the suit brought by LMOG, Mr. Greenberg testified that the LMOG suit had been dismissed and that he had not paid any funds to LMOG. He testified that he "had not been asked to pay it."

Mr. Greenberg acknowledged that LMOG had done legal work for Tennessee Mat Company before the defendant became Mr. Greenberg's personal attorney, that these earlier bills came from the firm, and that payment was remitted via checks payable to LMOG.

On cross-examination, Mr. Greenberg testified that LMOG had not accepted his offer to pay their claim against him and that ultimately their lawsuit against him was dismissed, possibly because of LMOG's failure to prosecute the case. He admitted that the $20,000 he paid the defendant "probably shoulda [sic] gone to the firm" and that he understood "the firm's position."

Paul Eichel, the owner of Music City Mix Factory, Inc., a company operating four nightclubs and a factory, testified that in late 1994 or 1995 he engaged the defendant as his business attorney. The defendant worked for Mr. Eichel and his company at an hourly rate, but no fee contract was signed. The defendant acted as Mr. Eichel's attorney until the defendant left Nashville in October 1996. Mr. Eichel assumed that his business manager received billings from LMOG for the defendant's work and issued checks payable to the firm.

Mr. Eichel testified that the defendant called him in September or October 1996 to arrange for Mr. Eichel to clear his account balance of $3,000 before the defendant left town. On October 8, 1996, Mr. Eichel directed his company manager to issue a Music City Mix Factory, Inc. check in the amount of $3,000 payable to the defendant. The memorandum blank on the check was filled in to read, "For last three months." The check was paid through a bank in Chicago. Mr. Eichel knew that the defendant was associated with LMOG during the time that Mr. Eichel was his client. Mr. Eichel recalled that the defendant left Nashville and went to Chicago on October 8, 1996.

Mr. Eichel testified that he thought the October 8, $3,000 payment satisfied his obligation for attorney fees but admitted on cross-examination that LMOG later claimed that he owed a balance of $16,000, for which LMOG later sued Mr. Eichel. Mr. Eichel testified that he settled the LMOG suit by paying $2,000 "to get rid of it."

Attorney Michael Geracioti, a partner in LMOG, testified that LMOG's method of employing an associate attorney, such as the defendant, was to pay a salary which could be supplemented by bonuses and proceeds from the "split-fee arrangement." This arrangement allowed the associate to "get [50 percent] of attorney's fees that they generate on a client that they . . . brought to the law firm." Mr. Geracioti testified that associates were informed of the split-fee arrangement when they began their service with LMOG, adding that LMOG looked at the arrangement "as an enticement to bring [associates] onboard, who are excited about . . . developing new business." LMOG's income receipts were given to the firm's bookkeeper, who would deposit the funds in the firm's general account. Mr. Geracioti explained that all funds had to go through the bookkeeper "to keep track" of the receipts for taxation purposes and for the payment of overhead expenses. He testified that fees received by LMOG were "the law firm's money," even if a client draws a check payable to an individual attorney in the firm. When attorneys in the firm would opt to leave the firm with split-fees still pending, the firm and the attorney would agree upon the handling of the outstanding fees.

Mr. Geracioti testified that the defendant left the firm without forming an agreement with the firm about unpaid fees and that he, in fact, left without providing any notice; in September and October 1996, the defendant just quit coming to work. Mr. Geracioti described the defendant's

-7-

abrupt departure as leaving the firm "in a lurch really, because . . . a good ninety percent or more of . . . the work he was doing were things that we really couldn't do, even if we wanted to." Mr. Geracioti explained that, after the defendant left, "we were very fearful that . . . there mighta [sic] been a ball up in the air, something – a deadline that needed to be met, things like that," and that the defendant left "absolutely" no notes about his files.

Mr. Geracioti identified the form letter that LMOG devised and sent to the defendant's clients on October 7, 1996, one of which was sent to Mr. Greenberg. The letter notified the clients that the defendant had left the firm, offered to resume legal services for any client who had urgent needs for such, offered to return or transfer to another firm any client's file, and informed the clients that unpaid fees generated by the defendant would be billed by the firm. The letter specifically informed clients not to pay legal fees directly to the defendant.

Mr. Geracioti identified LMOG's time sheet for Mr. Greenberg's "acquisition file" account. All of the work charged to this account was performed by the defendant, beginning August 5, 1994, and ending in August 1996. The total accrued fee for the work described on the file's time sheet was $21,996.88. The time sheet was prepared in the due course of the firm's business from time logs that were generated by the defendant in his own handwriting. Mr. Greenberg was never billed for this account prior to the defendant's departure from the firm.

Mr. Geracioti also identified time sheet records that reflected the defendant's charges to the Zeitlin and Eichel accounts.

Mr. Geracioti acknowledged that, after learning that Mr. Greenberg had paid the defendant, LMOG sued Mr. Greenberg in chancery court for his account balance.[2] Mr. Geracioti further acknowledged that although the suit had been tentatively dismissed pursuant to the docket rules of the chancery court, LMOG had taken the proper steps to revive the suit. Mr. Geracioti testified that LMOG also sued the defendant for moneys due on the Greenberg account.

Attorney Jon Jones testified that he videotaped the defendant's deposition in a civil case on November 20, 1996. He introduced a videotape of the deposition into evidence.

Lawrence Levine testified that he had been a partner in LMOG until 2006. The defendant had married Mr. Levine's daughter, Janet, and Mr. Levine and his wife had paid the defendant's expenses as a law student at Vanderbilt and had helped the defendant and Janet purchase a house. Mr. Levine generally reiterated the testimony of other witnesses who described the defendant's associate relationship with LMOG. He testified the defendant ceased coming to LMOG's offices in mid-September 1996. Mr. Levine testified that the firm had yet to receive outstanding fee payments from Mr. Greenberg or Mr. Eichel.

---

[2] Mr. Geracioti testified that Mr. Greenberg paid the defendant approximately $50,000 eight months after the defendant left the firm, that some or all of that payment was due LMOG, and that the suit included the $50,000 claim as well as the $20,000 Mr. Greenberg paid in October 1996.

After the State concluded its case-in-chief, the defendant opted to not testify but called witnesses Lance Bracey and Bryan Brooks.

Mr. Bracey, who was chief disciplinary counsel for the Tennessee Board of Professional Responsibility, testified concerning the responsibility of LMOG to escrow funds that came into its hands after the defendant's departure from the firm and against which the defendant and others may have held claims.

Mr. Brooks, an attorney, testified that he worked in 1980 for Mr. Levine's law firm and was sued by the firm when he left because Mr. Brooks continued to represent some of the firm's clients. Mr. Brooks opined that Mr. Levine attempted to hamper these clients' attempts to choose Mr. Brooks as their attorney.

Following the close of testimony, the defendant objected to the trial court's instructing the jury as to the subject of the theft being anything other than currency.

### III. Issues

### A. Sufficiency of the Evidence

In his first appellate issue, the defendant claims that the evidence was insufficient to establish that he committed theft of currency from LMOG; specifically, the defendant argues that the evidence showed neither a theft of currency nor that LMOG was the owner of the stolen property.

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). The rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654.

In determining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in the indictment in the present case, theft is committed by one who, "with intent to deprive the owner of property, . . . knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103 (1991). Theft is a Class C felony "if

-9-

the value of the property . . . obtained is ten thousand dollars ($10,000) or more but less than sixty thousand dollars ($60,000)." *Id.* § 39-14-105(4).[3]

The particular type of evidence insufficiency claimed by the defendant is typically known as a variance. A variance results when the evidence at trial does not correspond to the elements of the offense alleged in the charging instrument. *State v. Keel*, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994). In many such cases, the evidence establishes the commission of an offense different from the offense alleged in the charging instrument. *See id.* The variance rule is predicated upon the theory that an accused cannot be charged with one offense and convicted of a completely different offense. *See id.*

In the past, Tennessee has followed "a rather stringent variance rule, and if a person or thing necessary to be mentioned in an indictment is described with greater particularity than is requisite, such person or thing must be proved exactly as described in the indictment." *Bolton v. State*, 617 S.W.2d 909, 910 (Tenn. Crim. App. 1981). "The policy now followed in this and in most other jurisdictions," however, "is that before a variance will be held to be fatal it must be deemed to be material and prejudicial." *State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984). Moreover,

> [a] variance between an indictment and the proof in a criminal case is not material where the allegations and proof substantially correspond, the variance is not of a character which could have misled the defendant at trial and is not such as to deprive the accused of his right to be protected against another prosecution for the same offense.

*Id.*

The variance rule is related to the "surplusage rule." In this context, "surplusage" denotes surplus language in the charging instrument. In certain circumstances, such surplusage, in and of itself, may implicate insufficiency of the charging instrument as opposed to insufficiency of the convicting evidence; however, an indictment is not defective because of the inclusion of surplusage if, after eliminating the surplusage, the offense is still sufficiently charged. *State v. Culp*, 891 S.W.2d 232, 236 (Tenn. Crim. App. 1994).

In circumstances more frequently discussed in the caselaw and the circumstance at issue in the present case, a surplusage issue is one of variance when the State fails to prove the

---

[3]Apparently, the theft charge was based upon the aggregate fee payments of Greenberg and Eichel to the defendant.

existence of a fact that was alleged, albeit gratuitously, in the charging instrument. In this context, "surplusage" implicates an evidence-sufficiency issue.[4]

For example, in *State v. Witherspoon*, Witherspoon was tried pursuant to an indictment that alleged an assault that resulted in "serious bodily injury," despite that the proscriptive statute required only that the assault resulted in bodily injury. *State v. Witherspoon*, 769 S.W.2d 880, 884 (Tenn. Crim. App. 1988). This court said, "In our view, it makes no difference that the indictment charges 'serious bodily injury,' because mere 'bodily injury' is required. . . . In any event, the term 'serious' in the indictment as it is used to modify 'bodily injury' is surplusage." *Id.* The court held that the use of the surplus term "cannot enlarge the essential elements of the offense." *Id.*; *see also State v. Hopper*, 695 S.W.2d 530, 535 (Tenn. Crim. App. 1985) (holding that allegation in felony murder indictment that the homicide was committed "deliberately" was "surplusage and could not have misled the defendant in any manner"); *State v. Jones*, 953 S.W.2d 695, 700 (Tenn. Crim. App. 1996) ("Because sexual penetration is statutorily defined to encompass fellatio, we find that the phrase 'by fellatio' was unnecessary surplusage."); *State v. Matthew Douglas Cox*, No. E1999-00351-CCA-R3-CD, slip op. at 11-12 (Tenn. Crim. App., Knoxville, Oct. 20, 2000) (reviewing an indictment that charged the accused with sexually penetrating the victim "'while armed with a weapon'" and holding that, because the proscriptive statute did "not require the State to establish that the appellant was armed with a weapon during his penetration of [the victim] but only to establish that the appellant's possession of a weapon 'occurred in association with the unlawful sexual penetration, whether . . . [the possession] occur[red] before, during, or after the actual sexual penetration,' the term "while" was mere surplusage) (internal quotation marks omitted); *Bobby Roberson v. State*, No. 02C01-9203-CC-00069, slip op. at 14 (Tenn. Crim. App., Jackson, Dec. 1, 1993) ("While the indictment alleged two of the aggravating circumstances – force or coercion by an armed defendant and personal injury – the proof of both was not necessary to *establish* the offense."). Generally, unless the matters alleged in the indictment are essential elements of the crime, they may be disregarded in analyzing the sufficiency of the convicting evidence. *Church v. State*, 206 Tenn. 336, 359, 333 S.W.2d 799, 809 (1960).

With these legal principles in mind, we address the two issues of variance raised by the defendant: whether the State was required to – and did – prove (1) that currency was the subject of the theft and (2) that LMOG was the owner of such property.

_____

[4]Tennessee courts formerly required the State to prove "exactly as described in the indictment" facts alleged that expressed "greater particularity than is requisite." *Johnson v. State*, 596 S.W.2d 97, 102 (Tenn. Crim. App. 1979); *see Martin v. State*, 542 S.W.2d 638, 641 (Tenn. Crim. App. 1976) ("[I]f a person or thing necessary to be mentioned in an indictment is described with greater particularity than is requisite, such person or thing must be proved exactly as described in the indictment. If a man were charged with stealing a black horse, the allegation of color, although unnecessary, yet being descriptive of that which is material could not be rejected."). As pointed out above, however, this strict rule of variance was abandoned by our supreme court in *State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984).

*1. Subject of the theft – currency*

The indictment in the present case alleges that the defendant committed the theft of "property, to wit: United States currency."

As we have mentioned above, the Tennessee theft statute requires that the subject of the theft be property. T.C.A. § 39-14-103 (1991). Our criminal code, in part, defines "property" as

> anything of value, including, but not limited to, money, real estate, tangible or intangible personal property, including anything severed from land, library material, contract rights, choses-in-action, interests in or claims to wealth, credit, admission or transportation tickets, captured or domestic animals, food and drink, electric or other power.

*Id.* § 39-11-106(a)(28). Code section 39-14-103 does not require that the property be currency or be any other specific kind of property. Thus, the present indictment, after alleging the taking of "property," alleges that element in a more particularized form than that required in the proscriptive statute. Because the indictment alleged that the defendant stole "property," the gratuitous inclusion of the language "to wit: United States currency" brands this issue as one of surplusage.

Thus, one might possibly view the term "currency" as mere surplusage, through which the present indictment did not expand the facts the State was required to prove to establish the offense. Under such a view, the evidence was sufficient, even if, for the sake of argument, the proof did not show that currency was involved in the offense. *But see* T.C.A. § 40-13-202 (2006) (mandating that indictments "state the facts constituting the offense . . . in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment").

Ultimately, however, we need not make that determination for two reasons. First, we hold that the proof essentially established that currency was the subject of the theft. The clients Greenberg and Eichel paid by check. We are aware that a check is a negotiable instrument, *see* T.C.A. § 47-3-104(c) (2001), and as such, it is "an unconditional promise or order to pay a fixed amount of money, *see id*. § 47-3-104(a), and is "payable to bearer or to order at the time it is issued or first comes into possession of a holder . . . on demand, *see id*. §47-3-104(a)(1), (2), "if it (i) states that it is payable on demand or at sight, or otherwise indicates that it is payable at the will of the holder, or (ii) does not state any time of payment," *see id*. § 47-3-108 (a). In view of the checks' negotiability into cash, the theft of "currency" was shown in the present case.

Second, the defendant in the present case moved for and received a bill of particulars. The purpose of a bill of particulars is to provide the defendant with adequate information about the charged offense to allow him "(a) to prepare a defense, (b) to avoid prejudicial surprise at trial, and (c) to enable the accused to preserve a plea of double jeopardy." *State v. Shropshire*, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000); *see also State v. Byrd*, 820 S.W.2d 739, 741 (Tenn. 1991); Tenn. R.

Crim. P. 7(c) ("On defendant's motion, the court may direct the district attorney general to file a bill of particulars so as to adequately identify the offense charged.").

In the present case, the defendant moved pursuant to Tennessee Rule of Criminal Procedure 7(c) for a bill of particulars. Although the record does not contain the bill of particulars, it does include a minute-entry order by which the trial court found that, "upon due consideration and all the evidence introduced, [the] Motion for Bill of Particulars is complied with." According to the minute entry, the order was approved by counsel for both the State and the defendant and was signed by the trial judge. Under these circumstances, we must presume that the absent bill of particulars addressed the circumstances of the clients' payments that constituted the claimed theft, especially when the trial court found that, not only was the bill of particulars furnished by the State, but also that the motion for the bill "was complied with." The burden is upon the defendant, as the appellant, to present "a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). In the absence of a full and complete record revealing the issues that form the bases for the appeal, we must presume the correctness of the trial court's determination. *State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993); *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Moreover, we note that the defendant has not claimed that the evidence did not correspond to the bill of particulars.

In view of the use of a bill of particulars, the defendant was not misled by the indictment specification of "currency," even if the proof varied from the indictment and did not establish that currency was the subject of the offense.

### 2. Identity of the "owner" of the stolen property – LMOG

Next, the defendant claims that the proof varied from the indictment's allegation that the owner of the stolen property was LMOG. He argues that the evidence showed that the owners of the funds paid to him were Greenberg and Eichel, the clients. Part and parcel of this argument is the claim that these clients' payments did not discharge them from their obligations to LMOG but that, because the defendant was no longer a representative of LMOG when he solicited and received the payments, LMOG retained its entitlement to payment from these clients.

The present indictment alleges that the defendant stole "the property of [LMOG], without the effective consent of [LMOG]." Thus, one could view the charging language as alleging the ownership element by referring to an owner who did not consent to the taking of the property and that the specification of LMOG as that owner was mere surplusage. On that score, the defendant's claim is disposable along the same lines as that of property-versus-currency, above. The post-*Moss* case of *State v. Goins*, 705 S.W.2d 648 (Tenn. 1986), however, gives us some pause, and we elect to proceed as if the possibility of variance on the question of ownership were opened by the indictment. *See id.* at 650 (reviewing a conviction of receiving or concealing stolen property and stating that, although the "State does not have to show who stole the goods or the name of the victim of the theft," it must show "that the property is owned by someone other than the defendant" and that

-13-

"[i]f . . . ownership is placed in a certain person, that must also be shown").[5]  Because we determine that the defendant failed to show that the claimed variance was material, however, we need not determine whether the indictment and the evidence at trial were actually at variance.

Our criminal Code defines the term "owner" as "a person, other than the defendant, who has possession of or any interest other than a mortgage, deed of trust or security interest in property, even though that possession or interest is unlawful and without whose consent the defendant has no authority to exert control over the property."  T.C.A. § 39-11-106(a)(26).  In the 1989 criminal code, theft is generically proscribed by Code section 39-14-103.  *See id.* § 39-14-101, - 103.  As such, theft, including offenses formerly theorized as embezzlement, fraudulent conversion, and the like, may be committed generically in essentially one or two ways: (1) taking or obtaining property or (2) merely exercising control over the property, all without the owner's consent and with the requisite intent to deprive.  *See State v. Byrd*, 968 S.W.2d 290, 292 (Tenn. 1998).  Also, an owner's possession of the property may be "actual or constructive."  T.C.A. § 39-14-401(3); *see State v. Joel Christian Parker*, No. M2001-00773-CCA-R3-CD, slip op. at 3 (Tenn. Crim. App., Nashville, Dec. 18, 2002) (stating that pawn shop "employees" who had no proprietary interest in guns stolen from the shop were nevertheless "owners" and that the prosecution need not have proven who had title to the stolen property); *State v. Gordon Scott Katz*, No. E1999-01220-CCA-R3-CD, slip op. at 4-5 (Tenn. Crim. App., Knoxville, Oct. 2, 2000) (stating that the term "owner" includes one who is merely a "beneficial" owner).  Further, the term "person," as used in the definition of "owner," "includes the singular and the plural and means and includes any individual, firm, partnership, copartnership, association, corporation, governmental subdivision or agency, or other organization or other legal entity, or any agent or servant thereof."  *Id.* § 39-11-106(a)(27).  Our understanding of the term "owner" in the theft statute is also informed by the definition of "deprive."  The term "deprive" includes "[w]ithhold[ing] property from the owner permanently or for such a period of time as to substantially diminish the value or enjoyment of the property to the owner," *id.* § 39-11-106(a)(8)(A), and also "[d]ispos[ing] of property or us[ing] it or transfer[ring] any interest in it under circumstances that make its restoration unlikely," *id.* § 39-11-106 (a)(8)(C).

Guided by these definitions and principles, we cannot say that, at the time of indictment and trial, LMOG had *no* status as an "owner" of the property taken by the defendant, despite that LMOG's contractual claim against Greenberg and Eichel may have survived their payments to the defendant.  It may have been that, for purposes of the theft statute, LMOG, on the one hand, and Greenberg and Eichel, on the other, were both owners, and in that event, "ownership can be laid in either party and there will be no fatal variance."  *See Stafford v. State*, 489 S.W.2d 46,

---

[5]*Goins* adjudicated a double jeopardy issue, not a variance issue, and the court's comments about the naming of an owner of stolen property that had been received or concealed had no reference to the charging instrument at hand, which apparently named no such owner.  It may be that the *Goins* court's comments about establishing the identity of a named owner were peculiarly related to the former offense of receiving and concealing; the court noted, "The gravamen of the crime [is] the fact that the receiver knew that he was receiving stolen property."  *Goins*, 705 S.W.2d at 650 (quoting *Williams v. State*, 216 Tenn. 89, 95, 390 S.W.2d 234, 237 (1965)) (alteration in original).

-14-

47 (Tenn. Crim. App. 1972); *see also Hill v. State*, 38 Tenn. 454, 455 (1858). As explained more fully below, however, we need not be more precise in determining whether a variance occurred because, given the procedural history in this case, any variance could not be material or prejudicial.

As explained above, no insufficiency of the evidence is implicated by a variance unless it is material and prejudicial, and no variance is material when "the allegations and proof substantially correspond, the variance is not of a character which could have misled the defendant at trial and is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." *See Moss*, 662 S.W.2d at 592.

As explained above, the defendant moved for and received a bill of particulars, and for that reason, the defendant's claim that the test for materiality was met must fail. A bill of particulars that fairly outlines the evidence that is ultimately presented at trial generally defeats a claim of a material or prejudicial variance.

In sum, based upon our previous observations about the nature of ownership in the theft statute, we conclude that the terms of the indictment and the evidence at trial substantially correspond, and based upon the record, we find no indication that the defendant was hampered in the preparation and presentation of his defense. Further, the fact that the State "complied with" the defendant's motion for a bill of particulars is further proof that any claimed variance could not have been material or prejudicial. Of course, we recognize that the State's failure to *file* the bill of particulars means that no bill of particulars is of record to protect the defendant from double jeopardy by showing, in and of itself, that the theft claim related to property of Greenberg and Eichel as well as to LMOG. Nevertheless, this record on appeal, including this opinion, bears witness to the identity of the bases of a theft offense, *see Gordon Scott Katz*, slip op. at 5 (stating, in an analysis of the materiality of a variance, that "the appellant can rely upon this [appellate] record in the event that future proceedings are brought against him for the same offense"), and in any event, further prosecution of this theft is barred by the statute of limitations, *see* T.C.A. § 40-2-101(a) (2006) (establishing a limitation of prosecution of four years for a Class C felony); *see also Gordon Scott Katz*, slip op. at 5 (discerning no possibility of double jeopardy when "the appellant is in no danger of being subsequently charged"). Accordingly, our holding does not imperil the defendant of a second jeopardy.

Therefore, in the circumstances of this case, the claims of variances of the proof vis a vis the terms of the indictment must fail. The result of our analyses of the two variance issues raised is that the evidence of record sufficiently supports findings of the elements of the offense by the jury.

### B. Trial Court's Use of Pattern Jury Instructions

In his next issue, the defendant claims that the trial court erred in overruling his objection to the use of pattern jury instructions that detail the elements of theft. He argues that the instructions "fail[ed] to accurately describe the proper legal standard to determine an indispensable

-15-

element of the crime of theft in that ownership of property requires dominion over property, title to, possession of[,] or control over property." At trial, however, the defendant's argument about the instruction on theft focused upon the subject matter of the theft, currency, and in his brief, he specifies the offending instruction as follows:

> "'Property' means anything of value, including, but not limited to, money, real estate, tangible or intangible personal property, including anything severed from land, library material, contract rights, choses-in-action, interests in or claims to wealth, credit, admission or transportation tickets, captured or domestic animals, food and drink, electric or other power."

The defendant argues in his brief that the instructions should have been "limited to the facts presented into evidence" and that the instruction given constructively amended the indictment. He claims that, in defining property, the instruction's references to contract rights and choses-in-action invited the jury to convict the defendant based upon one or both of these descriptions of the property stolen and not upon the description of "currency" expressed in the indictment. He also argues in his brief that the indictment's identification of LMOG as the owner further invited the jury's consideration of contract rights or choses-in-action as the subject matter of the theft.

We are unpersuaded by the defendant's arguments.

First, the term "property" is the element used in the proscriptive statute for the subject matter of the theft, and the indictment alleged the theft of "property." We have already concluded that the indictment contained only surplusage concerning the specific property that was stolen. Furthermore, the challenged instruction tracks the definition of "property" contained in Tennessee Code Annotated section 39-11-106(a)(28). Thus, in this context, the trial judge's instructing the jury as to the statutory definition of the element of "property" was proper. "A trial court has the duty, in criminal cases, to fully instruct the jury on the general principles of law relevant to the issues raised by the evidence." *State v. Elder*, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998); *see Sandstrom v. Montana*, 442 U.S. 510, 527, 99 S. Ct. 2450, 2461 (1979) (stating that jury instructions must be viewed in the context of the overall charge rather than in isolation).

Second, we also concluded that, despite the indictment's reference to LMOG as the owner of the stolen property, the defendant failed to demonstrate that the evidence on this point resulted in a material variance. We fail to see how the reference to LMOG in the indictment combined with the definition of property provided by the trial court misled the jury or invited them to focus upon an example of "property" that itself caused a variance or a constructive amendment of the indictment.

Finally, even if the trial court erred in expressing the full definition of "property" to the jury, such error was undoubtedly harmless. *See State v. Turner*, 675 S.W.2d 199, 205 (Tenn. Crim. App. 1984) (holding that inclusion of surplusage in jury charge defining conspiracy was

-16-

"plainly harmless"); *see also* Tenn. R. Crim. P. 52(a) ("No conviction shall be reversed on appeal except for errors that affirmatively appear to have affected the result of the trial on the merits.").

In *State v. Faulkner*, 154 S.W.3d 48 (Tenn. 2005), the supreme court considered whether the inclusion of instructions defining nature-of-conduct and circumstances surrounding conduct was an error of constitutional dimension when the instruction also included the correct result-of-conduct definition. *Id.* at 58-59. After noting that a "misstatement of an element in jury instructions is subject to constitutional harmless error analysis," *id.* at 60 (citing *Pope v. Illinois*, 481 U.S. 497, 501-03, 107 S. Ct. 1918, 1921-22 (1987)), the court "conclude[d] . . . that the instructional error was not constitutional in nature" and determined that, because the "inclusion of the nature-of-conduct [instructional] language [in a trial on a result-of-conduct offense] was mere surplusage that did not affect the outcome of the trial," any error was harmless. *Id.* at 61. This reasoning applies in the present case. The trial court's instruction, if inapt, was harmless.

## C. Sentencing

In his final issue, the defendant claims that the trial court erroneously applied an enhancement factor – that the defendant abused a position of trust – to lengthen his sentence from the presumptive sentence of three years to five years. We divide our examination of the sentencing issue into (1) the state-law basis for enhancement raised by the defendant and (2) a constitutional analysis that was not raised by him.

### 1. State-law basis for enhancement

When a defendant challenges the length, range, or manner of service of a sentence, this court generally conducts a de novo review of the record with a presumption that the determinations made by the trial court are correct. T.C.A. § 40-35-401(d) (1990). This presumption, however, is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). In the present case, we apply the presumption of correctness.

The burden of showing that the sentence is improper is upon the appellant. *Id.* If the review reflects the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In making its sentencing determination in the present case, the trial court, at the conclusion of the sentencing hearing, was obliged to determine the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered

-17-

by the parties on the enhancement and mitigating factors, (6) any statements the defendant made in his behalf about sentencing, and (7) the potential for rehabilitation or treatment. T.C.A. § 40-35-210(a), (b); *id.* § 40-35-103(5); *State v. Holland*, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993).

The defendant, as a Range I offender convicted of a Class C felony, was punishable by a sentence that could range from three years, *see* T.C.A. § 40-35-111(b)(3), up to six years, *see id.* § 40-35-112(a)(3). The presumptive sentence applicable to the defendant was three years. *See id.* § 40-35-210(c). The sentencing regime applicable to the defendant's sentencing authorized the trial court to enhance a sentence above the presumptive sentence when it found that the defendant "abused a position of public or private trust, or used a professional license in a manner that significantly facilitated the commission or the fulfillment of the offense." *Id.* § 40-35-114(15) (1990).

The presentence report filed in the defendant's case indicated no prior convictions.

The defendant complains that the trial court applied factor (15) erroneously because he was no longer connected to LMOG when Greenberg's and Eichel's payments were made and that, accordingly, he no longer owed them a fiduciary duty. We disagree. Mr. Zeitlin testified that, on August 1, 1996, prior to the defendant's departure from the firm, he told Mr. Zeitlin that he had been "holding back some billings from current clients of the firm." This testimony was supported by that of Mr. Gambill, Mr. Wood, and Mr. Rosen. The firm was his employer in August 1996, and Mr. Rosen's and Mr. Geracioti's testimony showed that the defendant was obliged to facilitate the clients' payments through the firm account.

A relationship of private trust may exist between employer and employee. *See, e.g.*, *State v. Grissom*, 956 S.W.2d 514, 518 (Tenn. Crim. App. 1997). The enhancement factor is applicable when an employer entrusts the employee with access to money. *See State v. Elizabeth M. Clark*, No. E2002-01592-CCA-R3-CD, slip op. at 3 (Tenn. Crim. App., Knoxville, Dec. 1, 2003) (noting that defendant exploited her position as the bookkeeper to steal money from her employer). We conclude that in the present case, factor (15) was properly applied.

### 2. Constitutional basis

On June 24, 2004, the United States Supreme Court released its opinion in *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004), holding that "'[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" *Id.* at 301, 124 S. Ct. at 2536 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63 (2000)). The "statutory maximum" to which a trial court may sentence a defendant is not the maximum sentence after application of appropriate enhancement factors, other than the fact of a prior conviction, but the "maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Id.* at 303, 124 S. Ct. at 2537. Under *Blakely*, then, the "statutory maximum" sentence which may be imposed is the presumptive sentence applicable to the

offense. *See id.*, 124 S. Ct. at 2537. The presumptive sentence may be exceeded without the participation of a jury only when the defendant has a prior conviction and/or when an otherwise applicable enhancement factor was reflected in the jury's verdict or was admitted by the defendant.

At the time of sentencing in this case, September 6, 2006, the Tennessee Supreme Court had held that the Tennessee Criminal Sentencing Reform Act of 1989, pursuant to which Gomez was sentenced, did not run afoul of the Sixth Amendment right to jury trial as interpreted in *Blakely*. *See State v. Gomez*, 163 S.W.3d 632, 654-61 (Tenn. 2005) (*Gomez I*), *vacated and remanded*, *Gomez v. Tennessee*, ___ U.S. ___, 127 S. Ct. 1209 (2007). On January 22, 2007, the United States Supreme Court released its decision in *Cunningham v. California*, 549 U.S. ___, 127 S. Ct. 856 (2007), holding that California's sentencing scheme, which had numerous similarities to Tennessee's sentencing scheme, did not survive Sixth Amendment scrutiny intact under *Blakely*. Following on the heels of *Cunningham*, on February 20, 2007, the United States Supreme Court vacated *Gomez I* and remanded that case for reconsideration in light of *Cunningham*, *see Gomez v. Tennessee*, ___ U.S. ___, 127 S. Ct. 1209 (2007).

On remand in *Gomez*, the Tennessee Supreme Court applied the principles of *Blakely* and *Cunningham* to determine that Tennessee's pre-2005 sentencing code violated Gomez' right to jury trial. *State v. Gomez*, 239 S.W.3d 733 (Tenn. 2007) (*Gomez II*). The *Gomez II* court held that the trial court had committed plain error on constitutional grounds in applying factors for being a leader in the commission of the offenses and in possessing or employing a firearm to enhance sentences. *Id*. at 743.

That the defendant did not raise the *Blakely* issue prior to or during his appeal deprives him of plenary review; however, this court may consider plain error upon the record under Rule 52(b) of the Tennessee Rules of Criminal Procedure. *State v. Ogle*, 666 S.W.2d 58, 60 (Tenn. 1984). Before an error may be so recognized, however, it "must be 'plain' and it must affect a 'substantial right' of the accused." *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). The word "plain" is synonymous with "clear" or equivalently "obvious." *United States v. Olano*, 507 U.S. 725, 734, 113 S. Ct. 1770, 1777 (1993). "Rule 52(b) leaves the decision to correct the forfeited error within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id*. at 732 (citations omitted).

In *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000), our supreme court adopted the standard announced by this court in *Adkisson*. There, we defined "substantial right" as a right of "fundamental proportions in the indictment process, a right to the proof of every element of the offense, and is constitutional in nature." *Adkisson*, 899 S.W.2d at 639. Our supreme court also adopted *Adkisson*'s five factor test for determining whether an error should be recognized plain:

"(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;

-19-

(c) a substantial right of the accused must have been adversely affected;

(d) the accused did not waive the issue for tactical reasons; and

(e) consideration of the error is 'necessary to do substantial justice.'"

*Smith*, 24 S.W.3d at 282 (quoting *Adkisson*, 899 S.W.2d at 641-42). "[A]ll five factors must be established by the record before [a reviewing court] will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* at 283. Our supreme court also observed that "the 'plain error must [have been] of such a great magnitude that it probably changed the outcome of the trial.'" *Id.* (quoting *Adkisson*, 899 S.W.2d at 642) (internal quotation marks omitted).

Looking first at the adequacy of the record, we have before us the trial court record, including the presentence report and the transcripts of the trial and of the sentencing hearing, from all of which we can glean that the trial court enhanced the defendant's sentence for theft from the presumptive sentence of three years to five years. As pointed out above, the enhancement was based on the application of factor (14).

The issue at stake is the defendant's Sixth Amendment right to have a jury determine the factors that enhance his sentence beyond the presumptive sentence. In *Gomez II*, our supreme court determined that Gomez' sentence enhancement violated a clear and unequivocal rule of law for purposes of noticing plain error. As in *Gomez II*, the *Blakely* claim in the present case implicates a clear and unequivocal rule of law.

Looking next to whether the claimed violation of the Sixth Amendment adversely affected a substantial right of the defendant, the trial court utilized an enhancement factor that involved factual determinations of the "type . . . prohibited by Apprendi." *Gomez II*, 239 S.W.3d at 743. Thus, as in *Gomez II*, the enhancement of the sentence adversely affected a substantial right of the defendant.

"The fourth consideration for plain error review is whether the record indicates that the [d]efendant[] waived [his] Sixth Amendment claims for tactical reasons." *Id.* at 741. As in *Gomez II*, "the record in this case is silent and does not establish that the [d]efendant[] made a tactical decision to waive [his] Sixth Amendment claims." *See id.* at 742. Thus, the record evinces no basis in tactics or strategy for rejecting plain error review.

Finally, we examine the need for assuring substantial justice as a basis for noticing plain error. In *Gomez II*, our supreme court, in examining whether substantial justice had been availed or withheld, looked at the relative impact on sentence enhancement of Gomez' prior criminal record vis a vis the other, *Blakely*-infirm factors. The court commented that, as a reviewing appellate court, it was authorized to "[a]ffirm, reduce, vacate or set aside the sentence imposed," *id.* at 743 (quoting T.C.A. § 40-35-401(c) (2006)), suggesting that the court, if it could, would look at what sentence it would impose using the *Blakely*-compliant enhancement factor of prior criminal record

-20-

to determine whether the trial court's use of other factors deprived the defendant of "substantial justice." In *Gomez II*, however, the court determined that the record of "criminal histories [was] not sufficiently well-developed [to allow a] determin[ation of] the proper sentences based on this enhancement factor alone." *Id.* at 743. In that situation, the *Gomez II* court apparently reasoned, the appellate court could not bring an appropriate, *Blakely*-compliant sentence into focus, and accordingly, the court held that, to ensure substantial justice, it must remand the case to the trial court for a "resentencing hearing at which the trial court will have an opportunity both to determine the full scope of the Defendants' criminal histories and to consider whether imposition of the maximum sentence on all convictions is appropriate." *Id.*

Because this defendant has no prior criminal convictions, there are no *Blakely*-compliant factors applicable to his sentence. Thus, the defendant was entitled to the presumptive sentence, and the need for assuring substantial justice requires that we recognize the error as plain.

## IV. Conclusion

We hold that the trial court committed no error in imposing the defendant's conviction, and we affirm the conviction. Because the sentence is afflicted by a deprivation of the defendant's Sixth Amendment right to a jury determination of a basis for enhancement, we modify the sentence to a term of three years to be served in the Department of Correction.

_____
JAMES CURWOOD WITT, JR., JUDGE