# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 19, 2012 Session

## STATE OF TENNESSEE v. ROGER W. CHRISTY

**Appeal from the Circuit Court for Montgomery County**
**No. 4900910     John H. Gasaway, Judge**

---

**No. M2011-00852-CCA-R3-CD - Filed March 12, 2012**

---

A Montgomery County grand jury charged the defendant, Roger W. Christy, with one count of sexual battery by an authority figure, *see* T.C.A. § 39-13-527 (2006), and one count of sexual battery accomplished by force or coercion, *see* T.C.A. § 39-13-505. Following a bench trial, the trial court convicted the defendant of sexual battery by an authority figure and acquitted him of sexual battery accomplished by force or coercion. At sentencing, the trial court sentenced the defendant to three years' probation as a Range I, standard offender. On appeal, the defendant challenges the sufficiency of the evidence to support his conviction. Having determined that a fatal variance exists between the offense charged in the indictment and the proof presented at trial, we reverse the judgment of the trial court and dismiss the case.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Reversed and Dismissed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JERRY L. SMITH and CAMILLE R. MCMULLEN, JJ., joined.

Roger E. Nell, District Public Defender (on appeal); and Charles Bloodworth, Assistant Public Defender (at trial), for the appellant, Roger W. Christy.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Arthur Beiber, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Following a bench trial in the Montgomery County Circuit Court, the 27-year-old defendant was convicted of one count of sexual battery by an authority figure for

fondling the victim, J.B., during a visit to the defendant's home.[1] J.B. testified that she was 14 years old on May 15, 2009, when she visited the defendant's home with her cousins, Nettie Fowler and Susan Austin. The defendant picked up the victim and her cousins at the victim's home and purchased some "Green Apple Smirnoff" and other alcoholic beverages at a gas station on their way to his home. The victim testified that, when they arrived at the defendant's home, she "just sat on the couch and texted [her] friends." The defendant offered her alcohol to drink, and she tried the Smirnoff beverage. She said that it was the first time she had drunk alcohol. The defendant also played a video for about 15 to 30 minutes, which the victim described as "porn" because it showed "naked" people "having sex." The victim testified that the defendant also offered everyone Tramadols, a prescription pain medication. She declined the Tramadols, but she recalled that Ms. Fowler and Ms. Austin took some of the pills. She also testified that the defendant drank a six-pack of "Mike's [Hard] Lemonade" that night.

The victim testified that she went into the defendant's bedroom at approximately 10:00 p.m. to lie down because her back was hurting. She said that Ms. Austin and Ms. Fowler followed her to the bedroom, where they talked for awhile before Ms. Fowler left to meet her boyfriend. Ms. Austin's and the defendant's children were in a separate bedroom playing throughout the evening.

After Ms. Fowler left, the defendant came into the bedroom. The victim testified that the defendant started "rubbing" on Ms. Austin's "legs and that general area." The defendant then "started rubbing on [the victim]." The victim testified that the defendant put his hands under her shorts and underwear. She said that he touched her vagina and that his fingers "went inside" her. The victim testified that she told the defendant to stop, but he did not. She said the entire incident lasted approximately 10 minutes and ended when Ms. Austin "said something, . . . got out of the bed, and got mad and stormed off." Ms. Austin later returned to the bedroom. The victim unsuccessfully attempted to get a ride home by "texting" a friend, and she eventually fell asleep in the defendant's bed with Ms. Austin and the defendant. At approximately 3:00 a.m., the victim awoke, went to the kitchen to drink a glass of water, and fell asleep on the living room couch, where she slept until morning. The defendant drove her, Ms. Austin, and Ms. Austin's children home later that morning.

The victim testified that the defendant did not use any force against her in committing the sexual act. She also testified that there was no "adult authority figure" at the defendant's home. She said, however, that she trusted the defendant because she had known him all of her life. The victim admitted that she initially did not report the sexual contact and that the investigation originated from allegations concerning the alcohol and pornography.

---

[1] It is the policy of this court to refer to child sexual abuse victims by their initials.

The victim testified that she did not submit to a physical examination concerning the allegation. She also admitted that her mother, on the victim's behalf, had filed and obtained approval for criminal injury compensation funds totaling $1,000 to be paid when the victim turns 18 years of age.

Nettie Fowler described the defendant as her "cousin's foster child" and "just a friend." She testified that the defendant picked up her, the victim, Ms. Austin, and Ms. Austin's children at the victim's mother's home. They then went to the defendant's home, where the defendant watched "porn and stuff" in the living room. Ms. Fowler said that "there was drinking" at the defendant's home. She claimed that she "asked [the defendant] multiple times to turn off" the pornographic video, but he refused to do so. She said that the victim sat on the living room couch for most of the evening and "texted" friends. Ms. Fowler admitted taking Tramadol offered by the defendant. She did not know if the victim took any pills, but she recalled that the victim drank one "Smirnoff." Eventually, Ms. Fowler "texted" her boyfriend and asked him to pick her up because she "didn't want to be there." She testified that when she left the defendant's home, the victim, Ms. Austin, and the defendant were all in the bedroom talking. Ms. Fowler said that, at that time, nothing was "going on" between the victim and the defendant. She testified that the victim never told her anything about the sexual contact.

Rhonda Brown, the victim's mother, testified that her daughter "went [to the defendant's home] with two female adult cousins . . . to go watch movies and hang out for the night." The two cousins, Ms. Fowler and Ms. Austin, were 18 years old and 22 years old, respectively; Ms. Austin was dating the defendant at that time. Ms. Austin's two children, ages five years and 20 months, were also at the home, as was the defendant's four-year-old son. Ms. Brown understood that the defendant would sleep on the living room couch and allow the victim, her two cousins, and Ms. Austin's 20-month-old daughter to sleep in his bedroom. Ms. Austin's five-year-old son and the defendant's four-year-old son were to share a separate bedroom.

The defendant brought the victim home the next morning uneventfully. Several days later, however, Ms. Brown learned that the defendant had provided alcohol and watched "titty movies" with the victim, Ms. Fowler, and Ms. Austin during their stay. Based upon this information, the Department of Children's Services initiated an investigation concerning a possible contributing to the delinquency of a minor charge.

Detective Julie Webb of the Montgomery County Sheriff's Department investigated Ms. Brown's initial report concerning alcohol and pornography. Her investigation soon revealed the victim's allegation of sexual contact, although she acknowledged that the initial report contained no allegations of sexual contact. Detective

Webb also acknowledged that the victim, when testifying at trial, claimed for the first time that the defendant's fingers penetrated her vagina during the incident. Detective Webb interviewed the defendant within three weeks of the initial allegations. In a digital video recording of his statement that was presented at trial, the defendant admitted that he and Ms. Austin drank alcohol, but he denied watching pornography or having sexual contact with the victim on the night of the alleged offense.

The defendant testified at trial that the victim, her cousins, and Ms. Austin's children visited his home on May 15. He admitted purchasing Smirnoff beverages, but he denied providing any alcohol to the victim. He denied watching pornography at any time during the night and claimed that he watched "Dawn of the Dead," a zombie movie. The defendant admitted that he had Tramadol in his home, but he claimed it was prescribed to him to treat arthritis. He denied giving anyone any of his pills. He testified that Ms. Fowler had stolen the pills from Ms. Brown's home prior to the visit to his home. The defendant admitted that the victim and Ms. Austin spent some time in his bedroom playing with his dog. The defendant testified that he slept on the living room couch and took everyone home early the next morning because he had to be at work at 7:00 a.m.. The defendant denied touching the victim in an inappropriate manner. He said he had known the victim her entire life and that the idea that he would touch her sexually was "nasty" because he considered her "family."

At the conclusion of proof, the trial court in the bench trial found the defendant not guilty of sexual battery by force or coercion as charged in count two of the indictment. Regarding count one of the indictment, the court reasoned:

> With regard to count one, where [the defendant] is charged with sexual battery by an authority figure . . . there are two different ways that sexual battery by an authority figure can be accomplished. . . . One is that he was in a position of supervisory or disciplinary power, and he used that power to engage in unlawful sexual contact; th[e] evidence does not support that. The other one is that he – at the time of the alleged unlawful sexual contact[,] he was in a position of trust, and that that trust was used by the defendant to accomplish the sexual contact.
>
> The Court is convinced beyond a reasonable doubt that he is guilty of that offense, and he is found guilty by the Court of sexual battery by an authority figure.

At sentencing, the trial court sentenced the defendant as a Range I, standard offender to three years' probation. On appeal, the defendant challenges only the sufficiency of the evidence to support his conviction, arguing that insufficient proof exists to establish that any unlawful sexual contact occurred or that he used a position of trust to accomplish the alleged contact. The State asserts that the evidence is sufficient because the defendant abused a position of trust – his long-standing relationship with the victim and her family – to access the victim and accomplish the sexual contact.

Although not raised by either party on appeal or at trial, we note at the outset that a variance exists between the indictment allegation and the proof presented at trial. Count one of the indictment alleges:

> That on the 15th day of May 2009, and in the State and County aforesaid, [the defendant] unlawfully, feloniously and knowingly did have sexual contact with [J.B.] by touching her vagina, at a time when the said victim was thirteen years of age or older but less than eighteen years of age, and when the Defendant had *parental or custodial authority* over the victim, and the said Defendant used such authority to accomplish the sexual contact, in violation of TCA 39-13-527 and against the peace and dignity of the State of Tennessee.

(Emphasis added).

Tennessee Code Annotated section 39-13-527 provides:

> Sexual battery by an authority figure is unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by the following circumstances:
>
> (1) The victim was, at the time of the alleged offense, thirteen (13) years of age or older but less than eighteen (18) years of age; or
>
> (2) The victim was, at the time of the offense, mentally defective, mentally incapacitated or physically helpless, regardless of age; and
>
> (3)(A) The defendant was at the time of the offense in a position of trust, or had supervisory or disciplinary power over

the victim by virtue of the defendant's legal, professional or occupational status and used the position of trust or power to accomplish the sexual contact; or

(B) The defendant had, at the time of the offense, parental or custodial authority over the victim and used the authority to accomplish the sexual contact.

T.C.A. § 39-13-527. Thus, sexual battery by an authority figure occurs when a defendant accomplishes unlawful sexual contact with a victim as defined in Code subsections (1) or (2) either through the defendant's use of a position of trust or power, *see* T.C.A.§ 39-13-527(3)(A), or through the use of parental or custodial authority, *see* T.C.A. § 39-13-527(3)(B).

A variance results when the evidence at trial does not correspond to the elements of the offense alleged in the charging instrument. *State v. Keel*, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994). In many such cases, the evidence establishes the commission of an offense different from the offense alleged in the charging instrument. *See id.* The variance rule is predicated upon the theory that an accused cannot be charged with one offense and convicted of a completely different offense. *See id.*

In the past, Tennessee had followed "a rather stringent variance rule, and if a person or thing necessary to be mentioned in an indictment is described with greater particularity than is requisite, such person or thing must be proved exactly as described in the indictment." *Bolton v. State*, 617 S.W.2d 909, 910 (Tenn. Crim. App. 1981). "The policy now followed in this and in most other jurisdictions," however, "is that before a variance will be held to be fatal it must be deemed to be material and prejudicial." *State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984). Moreover,

[a] variance between an indictment and the proof in a criminal case is not material where the allegations and proof substantially correspond, the variance is not of a character which could have misled the defendant at trial and is not such as to deprive the accused of his right to be protected against another prosecution for the same offense.

*Id.* Generally, unless the matters alleged in the indictment are essential elements of the crime, they may be disregarded in analyzing the sufficiency of the convicting evidence. *Church v. State*, 333 S.W.2d 799, 809 (Tenn. 1960).

In this case, the indictment charged the defendant with sexual battery by an authority figure accomplished through the use of "parental or custodial authority." *See* T.C.A. § 39-13-527(3)(B). The trial court at the bench trial, however, convicted the defendant of sexual battery by an authority figure accomplished through the use of a "position of trust." *See* T.C.A. § 39-13-527(3)(A). Indeed, the trial court limited its consideration of the evidence to subsection (3)(A) as shown by its finding that the proof failed to establish that the defendant "had supervisory or disciplinary power" over the victim at the time of the offense. *See id.* Thus, we determine that a variance exists between the offense as charged in the indictment, on the one hand, and the proof presented at trial and the findings of the trial court, on the other hand.

The variance rule is related to the "surplusage rule." *State v. March*, 293 S.W.3d 576, 588 (Tenn. Crim. App. 2008). In this context, "surplusage" denotes surplus language in the charging instrument. In certain circumstances, such surplusage, in and of itself, may implicate insufficiency of the charging instrument as opposed to insufficiency of the convicting evidence; however, an indictment is not defective because of the inclusion of surplusage if, after eliminating the surplusage, the offense is still sufficiently charged. *State v. Culp*, 891 S.W.2d 232, 236 (Tenn. Crim. App. 1994). For this reason, a variance implicating the surplusage rule will rarely be deemed material and prejudicial so as to garner some relief on appeal. *See March*, 293 S.W.3d at 588-589 (full discussion of variance analysis as applicable to surplusage included in an indictment differing from evidence presented at trial).

"But the variance here is of a different kind." *State v. Henry L. Oliver*, No. 01-C-01-9003-CC-00081, slip op. at 5 (Tenn. Crim. App., Nashville, Sept. 19, 1990). When the essential elements of an offense alleged in an indictment differ from the facts established at trial, the variance has been described as one of "constructive amendment." In other words, "not only must the government prove the crime it charges, it must charge the crime it proves [and] after an indictment has been returned, its charge may not be broadened or changed except by action of the grand jury." *State v. Goodson*, 77 S.W.3d 240, 244 (Tenn. Crim. App. 2001) (citations omitted). As this court observed in *Goodson*,

> courts [must] distinguish between constructive amendments of the indictment, which are reversible *per se,* and variances between indictment and proof, which are evaluated under the harmless error doctrine. The accepted test is that a constructive amendment of the indictment occurs when the jury is permitted to convict the defendant upon a factual basis that effectively modifies an essential element of the offense charged. . . . In such cases, reversal is automatic, because the defendant may

-7-

have been convicted on a ground not charged in the indictment.

*Goodson*, 77 S.W.3d at 244-245 (quoting *U.S. v. Adams*, 778 F.2d 1117, 1123 (5th Cir. 1985)).

"[A] defendant cannot legally be convicted of an offense which is not charged in the indictment or which is not a lesser offense embraced in the indictment." *State v. Cleveland*, 959 S.W.2d 548, 552 (Tenn. 1997) (citing *State v. Trusty*, 919 S.W.2d 305, 310 (Tenn. 1996)). "[A]fter an indictment has been returned, its charge may not be broadened or changed except by action of the grand jury." *Goodson*, 77 S.W.3d at 244 (citing U.S. Const. amend. V; Tenn. Const. art. I, sec. 14; *United States v. Miller*, 471 U.S. 130, 148 (1985); *Stirone v. United States*, 361 U.S. 212, 215 (1960)). Before jeopardy attaches, however, a trial court may allow amendment to an indictment without the defendant's consent when "no additional or different offense is charged and no substantial right of the defendant is prejudiced." Tenn. R.Crim. P. 7(b)(2). Once jeopardy attaches, an indictment may only be amended by consent of the defendant. Tenn. R.Crim. P. 7(b)(1).

In this case, the defendant was convicted of an offense not charged in the indictment. No amendment occurred prior to trial via Rule 7(b)(1). Furthermore, nothing in the record suggests that the defendant consented to the amendment of the indictment after jeopardy attached. *See State v. Stokes*, 24 S.W.3d 303 (Tenn. 2000) (to comply with the requirements of Tenn. R.Crim. P. 7(b)(2), "an oral or written motion to amend the indictment should be made, and the defendant's oral or written consent to the motion must be clear on the record").

A so-called "constructive amendment" of the indictment, not consented to by the defendant, results in a fatal variance for its failure to accomplish the "overriding purpose of notice to the accused" required of an indictment. *See State v. Hammonds*, 30 S.W.3d 294, 300 (Tenn. 2000). Furthermore, a variance that results in a "constructive amendment" of the indictment is material and prejudicial because it is misleading to the defendant and fails to protect the defendant from another prosecution for the same offense. *See Moss*, 662 S.W.2d at 592.

In this case, the variance between the essential elements alleged in the indictment and the proof presented at trial resulted in a "constructive amendment."[2] We note that the State was not obliged to allege every alternative mode of liability available under

---

[2] The term "constructive amendment" as applied by the courts to trying a case on elements different from those expressed in the charging instrument is inapt and somewhat misleading. The term implies that an amendment effectively occurred when the opposite is actually the import of the term.

Code section 39-13-527 in order to provide notice to the accused. *State v. Lemacks*, 996 S.W.2d 166, 172 (Tenn. 1999). That being said, by alleging a specific statutory mode of liability, the State was obliged to prove that mode of liability and was precluded from achieving a conviction under a mode of liability different than that alleged in the indictment. *See*, *e.g.*, *State v. Paul Richardson*, W2008-02506-CCA-R3-CD (Tenn. Crim. App., Jackson, Sept. 29, 2010) (constructive amendment and fatal variance occurred when the trial court instructed the jury on aggravated assault by intentionally and knowingly causing another to reasonably fear imminent bodily injury but the indictment charged the defendant with aggravated assault by knowingly causing bodily injury to another), *perm. app denied,* (Tenn. Mar. 29, 2011); *State v. Jamie Roskom*, M2006-00764-CCA-R3-CD (Tenn. Crim. App., Nashville, Feb. 9, 2007) (constructive amendment and fatal variance occurred in prosecution of violation of the sexual offender registry act when indictment alleged failure to timely register but proof showed the defendant's failure to report to local law enforcement agency within a week of his birthday); *State v. Atta Najjar*, W2003-00329-CCA-R3-CD (Tenn. Crim. App., Jackson, Jan. 21, 2004) (constructive amendment and fatal variance occurred when jury instruction in aggravated rape case allowed conviction based upon a theory of aggravated rape not alleged in the indictment), *perm. app denied,* (Tenn. June 1, 2004). As this court explained in *Goodson*, "reversal is automatic." *Goodson*, 77 S.W.3d at 245 (quoting *Adams*, 778 F.2d at 1123).

At this juncture, we acknowledge again that neither party has raised the variance issue on appeal or, apparently, in the trial court. With the case in that polemical context, we have pondered whether this court should filter the variance error through a plain error analysis. Ultimately, we conclude that plain error analysis is not proper because the error described in the authorities cited above results in a void and not merely a voidable conviction.

This court has been inconsistent in its disposition of cases involving fatal variances caused by constructive, or putative, amendments. *See*, *e.g.*, *Goodson*, 77 S.W.3d at 245 (conviction reversed); *Paul Richardson*, slip op. at 14 (conviction reversed and vacated); *Jamie Roskom*, slip op. at 5 (conviction reversed and case dismissed); *Atta Najjar*, slip op. at 6 (conviction reversed and case remanded for new trial); *Henry L. Oliver*, slip op. at 6 (conviction reversed and dismissed). Because the fatal variance in this case voids the conviction and because the State failed to establish sufficient evidence of the crime *as charged*, we determine the apt disposition to be a reversal of the conviction and dismissal of the remaining one count of the indictment. Accordingly, we reverse the judgment of the conviction and dismiss the case.

_____
JAMES CURWOOD WITT, JR., JUDGE