IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 18, 2014

**STATE OF TENNESSEE v. JOSHUA PAUL LEWIS**

**Appeal from the Criminal Court for Cumberland County**
**No. 100008    Leon C. Burns, Jr., Judge**

---

**No. E2014-00918-CCA-R3-CD-FILED-FEBRUARY 25, 2015**

---

The defendant, Joshua Paul Lewis, was convicted of two counts of rape of a child, Class A felonies, and one count of attempted rape of a child, a Class B felony. He received twenty-five year sentences for the convictions for rape of a child and a ten-year sentence for attempted rape of a child, all to be served concurrently, for an effective sentence of twenty-five years. On this delayed appeal, the defendant argues that (1) the trial court erred in denying his motion to suppress; (2) the trial court erred in denying his motion for acquittal; and (3) the cumulative effect of the errors at trial deprived him of his right to a fair trial. After reviewing the record, the briefs of the parties, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

Russell C. Tribble, Cookeville, Tennessee, for the appellant, Joshua Paul Lewis.

Robert E. Cooper, Jr., Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Amanda Hunter and Gary McKenzie, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts and Procedural History**

The defendant's judgments of convictions were entered on June 27, 2011, and he filed a motion for a new trial on October 3, 2011. Although the motion was untimely filed, the trial court conducted a hearing on October 7, 2011, and denied the motion from the bench. On direct appeal, this Court concluded that the defendant had waived appellate review of the issues raised on appeal due to his failure to file a timely motion for new trial. *State v. Joshua Paul Lewis*, No. E2011-02377-CCA-R3-CD, 2012 WL 4392749, at *9 (Tenn. Crim. App. Sept. 26, 2012). This Court summarized the factual background of the defendant's case as follows:

> The Defendant was indicted in January 2010 for two counts of rape of a child and one count of attempted rape of a child. Each count involved the same victim, a male born on April 29, 2000. Each count alleged that the crime was committed "on a specific day between May 1, 2009 and July 31, 2009, in Cumberland County, Tennessee." In May 2010, the defense filed a motion for a bill of particulars requesting the "exact time and date of" each offense and the "exact location" of each offense. The State responded that the offense alleged in Count 1 occurred "[b]etween the dates of May 1, 2009 and July 31, 2009" and took place at the "Cumberland Mountain State Park, Cumberland County TN." The response gave the same description of the "time and date" as to Counts 2 and 3. The location of the crime alleged in Count 2 was described as the "residence of Valerie D[.] at 940 Old Highway 70, Crossville, TN." Finally, the response described the location of the crime alleged in Count 3 as "OakLawn Cemetery Pomona, POW Camp Road, Cumberland County TN."
>
> Also prior to trial, the defense filed a motion to suppress the Defendant's statement to the police. At the ensuing hearing, Investigator Jeff Slayton with the Cumberland County Sheriff's Department testified that he was one of the officers who interviewed the Defendant on December 9, 2009. He identified an "Admonition and Waiver and Waiver of Rights" document bearing the same date and signed by the Defendant. The document also indicates a time of 9:07 p.m. This document was subsequently admitted into evidence.
>
> Investigator Slayton stated that, earlier that day, he had been in a "lengthy . . . vehicle pursuit" of the Defendant. During the Defendant's apprehension, he was pepper-sprayed at some time late in the afternoon, but before 6:00 p.m. Investigator Slayton stated that he had been pepper-sprayed as part of his training and that the effects last from thirty to forty-five minutes.

2

Investigator Slayton interviewed the Defendant together with Investigator Chad Norris. A "DCS" agent, whose name he could not remember, was also present. The interview took place in the training room of the justice center. The Defendant was in custody at the time.

Investigator Slayton read the Admonition and Waiver to the Defendant, and the Defendant then read the Waiver of Rights out loud. According to Investigator Slayton, the Defendant had no trouble reading the document. The Defendant did not complain about being unable to read because of the pepper-spray. After the Defendant had read the Waiver of Rights out loud, he signed it. Investigators Slayton and Norris both witnessed the Defendant's signature.

Investigator Slayton proceeded to question the Defendant about the pursuit. He also questioned him about the instant allegations, of which Investigator Slayton had just learned. At no time did he promise the Defendant a lower bond if he confessed to the sex offense charges. After Investigator Slayton finished his oral interview of the Defendant, Investigator Norris reduced the Defendant's statement to writing.

On cross-examination, Investigator Slayton maintained that the Defendant's eyes were not "irritated" during the interview and that the Defendant had been able to look at and focus on Investigator Slayton. He also maintained that the Defendant was "calm" and "understanding" while the Admonition and Waiver was read to him. Investigator Slayton described this information as the Defendant's *Miranda* rights. The Defendant did not have on handcuffs, but Investigator Slayton did not remember if the Defendant had on leg-shackles. According to Investigator Slayton, there was no audio-recording of the interview.

Investigator Chad Norris with the Cumberland County Sheriff's Department testified that he witnessed the Defendant sign the Waiver of Rights. He also stated that he reduced the Defendant's statement to writing. He identified the document and explained his process for creating it:

> The way I do my statements is, I will write a portion of it, after what they've told me what they want to say, I'll write their words and I'll read back what I've wr[itten]; and then I'll continue on with it, write a small—another portion of it, read it back, and all the time asking them, "Is this what you

3

want me to say? Is this correct?" And I do that throughout the whole statement. Then I give them the statement and have them read over it.

Investigator Norris confirmed that he followed this process with the Defendant's written statement. He then read the statement into the record:

> I had several sexual contacts with [the victim] after he came on to me. I touched his penis several times, I'm not sure exactly how many times. He played with my penis several times as well. I never came/ejaculated while he played with my penis. When it first started we were both into it, but in the later part of the relationship [the victim] was more into it than me. I gave him a blow job more than one time, but I'm not sure exactly how many times. Most of the sexual acts occurred at Valerie D[ ]s' house on Old Highway 70. On one occasion while at the cemetery on POW Camp Rd not too far from Valeries's house [the victim] wanted to have sex in Valerie's van. He got in the back seat and took his pants off. He had his legs raised up and I had my pants unzipped with my penis out. I had a condom on and was about to put my penis in his butt, but decided [to] stop before we had intercourse. At a house on Old Mail Road where I was doing work me and [the victim] laid on top of each other, but nothing happened there. I wish these things hadn't happened and I would take them back if I could.

Investigator Norris testified that the Defendant signed this written statement at 10:45 p.m. He also testified that he did not promise the Defendant a lower bond if he confessed to these crimes.

On cross-examination, Investigator Norris stated that it was "typical" for him to write a suspect's statement. Investigator Norris also affirmed that the Defendant had been taken into custody on unrelated charges. He stated that he had previously interviewed the Defendant on the instant charges on August 11, 2009, in the Defendant's driveway. He did not obtain a statement from the Defendant on that day.

The Defendant testified at the suppression hearing that he had run from the police on December 9, 2009, because he had been told they were going to beat him up. He also stated that he "remember[ed] getting beat up by most of

4

the sheriff's department and maced a couple of times." His eyes were burning, and he tried to rinse them with water, but "that made it a hundred times worse." He did not remember at what time he was sprayed because he "was on Xanax," but he stated that it was "dark out." He described the sensation of being sprayed as "someone was jabbing a knife in [his] eye."

When asked about the interview, the Defendant stated that all he could remember talking about was "running from the cops." He did not remember Investigator Norris presenting him with the written statement. He acknowledged having signed some "papers" but stated that he was not sure what they were and that he did not read them. He testified that the officers told him "that if [he] signed the paper that they would make sure [he] got the lowest bond possible to get out." He stated that he had not been capable of reading during the interview because his eyes were still burning. He also stated that he did not remember his *Miranda* rights being read to him.

On cross-examination, the Defendant stated that he was twenty-eight years old and could read and write. When shown his statement, he acknowledged that the signature "look[ed] pretty close to" his own. He also averred that he had bad eyesight, including "astigmatisms."

The defense argued that the Defendant's statement was not voluntary. The trial court disagreed, ruling from the bench that "the proof is overwhelming in favor of [it] being a voluntary statement." Accordingly, the trial court denied the Defendant's motion to suppress. At the subsequent jury trial, held in March 2011, the following proof was adduced.

Valerie D., the victim's mother, testified that she had three children: an elder son, who was twelve years old at the time of trial; the victim, ten years old at the time of trial; and a daughter, seven years old at the time of trial. In 2009, she and the children lived in Cumberland County on Old Highway 70. She was using methamphetamine at the time, but she had been "clean" for a year and a half preceding the trial.

The victim's mother identified the Defendant and explained that she had met him in 2003 through Athena Donaldson, a mutual friend. She described the Defendant as having been "very good with children." Her sons were "very young at the time," and the Defendant "was very polite, very nice around them, and he would like to take them places." She and the Defendant both moved away, however, and she did not see him again until 2009, when

5

he began staying with Donaldson.

After the Defendant learned of the victim's mother's whereabouts in 2009, he began visiting her again. She described him as her friend at the time and a friend of the children. She testified that she trusted him, adding,

> He was really good with kids, and I trusted him enough to send them away with him, because he had his own business, and he mowed lawns, and I thought it would . . . be a good thing for the boys to get out of the situation at home and go have like a little part-time job, something they could . . . grow on, and have a little bit of money, and, you know, learn the value of a dollar. And so they would go with [the Defendant] to go and mow lawns and other things.

The victim had turned nine years old in April of that year. The victim's mother testified that her two sons were with the Defendant most of the summer of 2009. However, toward the latter part of the summer, the Defendant began spending more time with the victim, leaving the elder son behind.

The victim's mother became concerned about the discrepancy in the time the Defendant was spending with her sons. She took the victim to a park on a day near the end of July to speak with him privately. Based on this conversation, during which the victim was "[s]cared" and "crying," she became very concerned. They went to the police station the next day. After this conversation, she decided not to allow the victim to be around the Defendant.

On cross-examination, the victim's mother acknowledged that she and the Defendant used methamphetamine together while the children were asleep. She stated that the Defendant took the victim without his brother "several times" during the summer of 2009. She denied having ever witnessed the Defendant touch the victim inappropriately.

Investigator Slayton testified at trial that he interviewed the Defendant on December 9, 2009. Investigator Chad Norris was also present. Investigator Slayton identified the Defendant's written waiver of his rights and his written statement, and both were introduced into evidence without objection. He stated that, prior to the Defendant's signing the waiver, he read the Defendant his *Miranda* rights. He even had the Defendant read out loud the waiver of

6

those rights. He witnessed the Defendant then sign the Waiver of Rights. The Defendant then agreed to speak with Investigator Slayton.

Investigator Slayton testified that he then interviewed the Defendant about the instant charges. After the verbal interview, a written statement was prepared, which the Defendant then adopted and signed. Investigator Slayton read the written statement set forth above to the jury. Investigator Slayton testified that, at the time he gave his statement, the Defendant "was very coherent and very understanding of everything that was going on in the room at that time." According to Investigator Slayton, the Defendant "began to tear up" during his statement and "seemed very remorseful for what he was telling [him] had happened."

On cross-examination, Investigator Slayton acknowledged that the interview lasted an hour and forty-five minutes and began shortly after nine o'clock in the evening. He denied having pressured the Defendant "in any way." He also stated that there was no audio or video recording of the interview. He acknowledged that the written statement was in Investigator's Norris's handwriting.

The victim testified that he was currently ten years old. During the summer of 2009, when he was nine years old, he lived in a house on Old Highway 70 in Cumberland County with his mother and siblings. The Defendant, whom the victim identified in court, came by and visited, and he spent some time alone with the Defendant that summer.

The victim testified that, during the summer, he went with the Defendant to the state park in Crossville in the Defendant's car, a Firebird or a Thunderbird. The victim played at the park for a while and then went to use the bathroom. The Defendant followed him into the restroom. There was no one else present. The victim went into a stall, and the Defendant went into the stall with him. The victim found this "very odd" and, consequently, was "scared." The victim stated that the Defendant put the victim's penis in his mouth.

The victim next identified a photograph of a couch in the victim's house. On a day during the summer of 2009, he was on the couch with the Defendant. The victim was wearing pants. The Defendant put the victim's penis in his mouth.

7

The victim next identified a photograph of Oaklawn Cemetery that the victim stated was in Cumberland County. The cemetery was close to the victim's house. During the summer of 2009, the victim went there with the Defendant in the victim's mother's van. They drove to a spot where the road was not visible and parked. The victim was in the front seat, but the Defendant told him to get in the back of the van. The victim did so and saw the Defendant put a condom on the Defendant's penis. The Defendant then pulled down the victim's pants and "tried to stick it up . . . [the victim's] butt." The victim testified that he was "scared." The episode lasted "a couple of minutes." The victim did not feel the Defendant's penis inside him, but he stated it was "close." The Defendant stopped, saying he thought he saw a light in a house nearby. They then left the cemetery.

Later, the victim told his brother what had happened. His brother told their mother, and the victim then talked to his mother about it at a park. They went to the police station, and he "told this lady what happened." The victim testified that the Defendant had told him not to tell anyone or they "would crash into a brick wall." They were in the Defendant's car when the Defendant said this to the victim.

Investigator Norris testified that he first learned about the allegations involving the victim in late July 2009. On that day, the victim's mother and the victim came in and made a report. A Department of Human Services worker was assigned and interviewed the victim at the House of Hope. Investigator Norris watched this interview on television while it was being conducted and recorded. There was also a forensic medical exam conducted of the victim, but the results were inconclusive.

After the victim was interviewed, Investigator Norris began looking for the Defendant. They spoke over the phone and scheduled an interview. On August 11, 2009, Investigator Norris, accompanied by Investigator John Haynes, met the Defendant at the Defendant's residence. They spoke outdoors. The Defendant was advised of his *Miranda* rights and agreed to speak with them. When they informed the Defendant that they were there because of the victim, the Defendant "became emotional" and "requested to stop talking." Investigator Norris told the Defendant, "[W]e'll get back in touch," and the two officers left.

Investigator Norris testified that "two days or so after that," he attempted to contact the Defendant but was unsuccessful. Numerous

8

subsequent attempts were also unsuccessful. In December, he learned that the Defendant was at the Justice Center. The Defendant's interview and statement ensued. Investigator Norris identified places on the written statement that contained corrections requested by the Defendant and bearing the Defendant's initials. Investigator Norris also signed the statement as a witness. The statement is dated December 9, 2009, at 10:45 p.m. Investigator Norris explained that the time indicated the end of the interview and statement. Investigator Norris confirmed that he had written out the statement. He also opined that the Defendant understood what was being recorded in the statement as Investigator Norris was composing it. The Defendant did not appear to be under the influence of any drugs or narcotics. The Defendant had told him, however, that he had been "maced" earlier. Investigator Norris stated that he had been sprayed with mace and knew it to be "not pleasant at all." He added that, "by 30 minutes, the main effects were gone from it."

The Defendant testified at trial that he was currently twenty-nine years old. He worked as a landscaper. He had a prior conviction for driving on a revoked license. He described his relationship with the victim as "trying to be a friend of the family." He took the victim to mow yards, go fishing, play laser tag, and they went to "Chuckles." At the beginning of his friendship with the victim's mother, when he was living with Donaldson, the victim's mother would bring her children over "and drop them off for days at a time."

The Defendant acknowledged having signed the statement written by Investigator Norris. He testified that he "actually didn't know what [he] was signing, but [he] was told [he'd] be able to bond out and get out of there. [He] was under a lot of stress, and [he] had been roughed up and maced prior to coming in." About his initial August conversation with Investigators Norris and Hayes, he testified as follows:

[W]e stood there and talked for quite some bit, and they just started getting into saying—talking about personal things, about, if I remembered how it was when I was nine years old when I woke up on my belly and had a hard-on. It was just questions like that, and I was starting to get upset about them. I didn't really feel comfortable with them talking to me about stuff like that. And then they brought up [the victim], and I told them that I had no knowledge of anything—any of the accusations made towards me. I then told them that I didn't want to speak with them anymore, that I'd like to get in touch with an attorney. And my niece come running out to me, and that's when I ended the whole conversation and walked away.

9

As to the interview at the Justice Center in December, the Defendant stated that he had been handcuffed and shackled. He stated that, initially, there were three other people in the room, but the female was asked to leave after he kept denying the accusations. About midway through the interview, Investigator Norris left, and Investigator Slayton "got a little bit more fierce." He stated that he did not remember signing the Waiver of Rights document.

The Defendant denied ever touching the victim inappropriately. He disagreed with the assertions in the written statement. He testified that the victim "asked [him] one time if he could call [him] dad and stuff, and it turned into kind of a father-son relationship after that."

On cross-examination, the Defendant stated that, before he was "maced" on December 9, 2009, he had been fleeing from the police "in fear for [his] life." He explained that the victim's mother had told him that "something bad was going to happen to [him]," that her ex-boyfriend was friends with an officer, and that "he was going to make sure that [the Defendant] didn't make it to court." He stated that Investigators Norris and Slayton had lied and that the victim had lied. He averred that he signed the written statement because he "wanted a bond, [he] wanted to get out of jail." He testified that the investigators told him, "Once you sign this paper, you can go." He said that he was not fully aware of what was in the written statement. He explained that he had a lot of medical problems with his eyes, that he had been "maced," and that he was "on" Xanax and methamphetamine at the time. He did not remember telling the investigators that he had not used drugs for three months and that he had not been drinking alcohol.

. . . .
After hearing this proof, the jury convicted the Defendant on all three counts as charged. The trial court subsequently sentenced the Defendant to twenty-five years on each of the two rape of a child convictions and to ten years on the attempted rape of a child conviction. The trial court ordered that the sentences run concurrently and be served in the Department of Correction.

*Joshua Paul Lewis*, 2012 WL 4392749, at *1-8 (footnotes omitted).

The defendant filed a petition for post-conviction relief, and pursuant to the agreement of the parties, the trial court stayed the petition and permitted the defendant to file a delayed motion for new trial. The trial court subsequently denied that motion, and the defendant now appeals.

10

## II. Analysis

## A. Motion to Suppress

The defendant argues that the trial court erred in denying his motion to suppress because his statements to officers were not voluntary due to intoxication, incapacity, and promises of a bond reduction. Specifically, he claims that he was under the influence of Xanax and methamphetamine, that he was unable to read or comprehend the documents that he signed because he had been pepper sprayed prior to the interrogation, and that officers coerced him to sign the documents by promising to reduce his bond.

The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this Court unless the evidence contained in the record preponderates against them. *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001). The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). However, the application of the law to the facts found by the trial court is a question of law that this Court reviews *de novo*. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000).

In order for a defendant's written statement to be admissible, a defendant must have been apprised of the right to remain silent and right to an attorney, and the defendant must have voluntarily and knowingly waived those rights. *State v. Echols*, 382 S.W.3d 266, 280 (Tenn. 2012) (citations omitted). Courts must examine the totality of the circumstances to determine whether a waiver of *Miranda* rights was voluntary and knowing. *State v. Climer*, 400 S.W.3d 537, 568 (Tenn. 2013). Factors to consider in determining voluntariness include: "the age and background of the defendant, the level of education and intelligence, reading and writing skills, demeanor and responsiveness to questions, prior experience with police, any mental disease or disorder, any intoxication at the time of waiver, and the manner, detail, and language in which the *Miranda* rights were explained." *Echols*, 382 S.W.3d at 280-81.

The trial court found that "the proof [was] overwhelming in favor" of a finding that the defendant's statement was voluntary. We agree with the finding of the trial court. The testimony at the motion to suppress hearing demonstrated that Investigator Slayton read the waiver form aloud to the defendant and then had the defendant read the form aloud himself before signing it. The defendant signed the form nearly three hours after police had to subdue him with pepper spray, and he did not complain that the pepper spray prevented him from reading the document. Investigator Slayton testified that the defendant's eyes were not irritated during the interview and that he was calm and understanding when Investigator Slayton read the waiver form to him. Investigator Slayton also testified that he was pepper-sprayed himself as part of his training and that the effects of the pepper-spray usually

11

dissipated after forty-five minutes. Investigator Norris wrote the defendant's statements, using the defendant's own words, and gave the statement back to the defendant for him to read. The defendant admitted that the signature on his statement looked very similar to his, and his initials were placed next to portions of the statement that Investigator Norris had marked out or corrected to confirm that the changes were made during the interview. Both officers testified that they did not promise a bond reduction for the defendant in exchange for his confession. The trial court implicitly credited the testimony of the officers over the defendant's claims that he could not remember much of the interview because he was intoxicated and suffering from the effects of the pepper spray. We conclude that the record does not preponderate against the findings of the trial court. Accordingly, we affirm the trial court's denial of the motion to suppress.

## B. Variance

The defendant argues that the trial court erred in denying his motion for a judgment of acquittal because there was a fatal variance between the information provided in the bill of particulars and the proof presented at trial. Specifically, he contends that the bill of particulars indicated that the offenses occurred between May 1, 2009, and July 31, 2009, while the proof at trial demonstrated that the offenses occurred during the summer of 2009, "which encompassed a time period from June 21 to September 21." He also contends that for Count 1 of the indictment, the bill of particulars specified that the offense occurred in the Cumberland Mountain State Park in Cumberland County, Tennessee, but the proof at trial showed that the offense occurred in a state park in Crossville, Tennessee. The State responds that the defendant's characterization of the dates and location of the offenses proved at trial is "incomplete." We agree with the State.

A variance exists when the evidence presented at trial does not correspond with the elements of the offense as charged in the indictment. *State v. March*, 293 S.W.3d 576, 588 (Tenn. Crim. App. 2008). In order for a variance to be deemed fatal, it must be material and prejudicial. *State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984). "A variance between an indictment and the proof in a criminal case is not material where the allegations and proof substantially correspond, the variance is not of a character which could have misled the defendant at trial and is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." *Id.* (citations omitted). A variance is harmless unless it affects the substantial rights of the defendant. *Id.* "[A] variance does not prejudice the defendant's substantial rights (1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or surprised at trial, and (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense[.]" *Id.* There is a material variance "only if the prosecutor has attempted to rely upon theories and evidence at the trial that were not

12

fairly embraced in the allegations made in the charging instrument." *State v. Shropshire*, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000).

An indictment may be defective if it contains surplus language. *March*, 293 S.W.3d at 588; *State v. Eric Parker*, No. E2013-02339-CCA-R3-CD, 2014 WL 5483015, at *6 (Tenn. Crim. App. Oct. 29, 2014). "[H]owever, an indictment is not defective because of the inclusion of surplusage if, after eliminating the surplusage, the offense is still sufficiently charged." *March*, 293 S.W.3d at 588. If the State gratuitously alleges but fails to prove a fact in the charging instrument, the issue of variance becomes one of surplusage. *Id.* at 588-89.

The defendant contends that he was "prejudicially surprised" when the proof at trial showed only that the incidents occurred in the summer of 2009, which encompasses a time period of June 21, 2009, to September 21, 2009, leaving a time period of fifty-two days for which the defendant could have prepared an alibi defense. However, as the State points out, this argument mischaracterizes the proof presented at trial because "[t]he dates testified to at trial were far more specific than simply the 'Summer of 2009.'" While the victim and his mother testified that the offenses occurred in the summer of 2009, the victim told his mother about the abuse on July 26, 2009, and she went to the police with the allegations the next day. The victim testified that the abuse occurred during the summer of 2009 "for about a month and a half." Investigator Norris testified that his investigation led him to conclude that "absolutely" no abuse occurred after July 28 or July 29, the date when he first spoke with the victim. The evidence at trial showed that the offenses occurred during the summer of 2009 and that no offense occurred after July 31, 2009, the date alleged in the bill of particulars. Accordingly, we conclude that there was not a variance between the bill of particulars and the proof at trial. The defendant is not entitled to relief as to this issue.

Similarly, his claim regarding the location of the offense must fail. In the bill of particulars, count one referred to an incident that occurred at Cumberland Mountain State Park in Cumberland County, and the proof at trial showed only that the offense occurred in a state park in Crossville. The language specifically identifying the state park was surplusage because the location of the crime is not an element of rape of a child. Any variance was not fatal. The defendant has shown no proof that he was unable to prepare a defense or that any alleged variance in the location of the state park specified in the bill of particulars and the location testified to at trial caused him prejudice. Further, the defendant is not at risk of being prosecuted twice for the same offense. *See State v. Henry Floyd Sanders*, No. M2011-00962-CCA-R3-CD*, 2012 WL 4841545, at *14 (Tenn. Crim. App. Oct. 9, 2012) (observing that "[d]ouble jeopardy prohibits subsequent prosecution of appellant for offenses against the victim occurring within the same time frame the State alleged in the indictment"). The defendant is not entitled to relief as to this issue.

13

## C. Cumulative Error

The defendant argues that the cumulative effect of the errors in his trial deprived him of the right to receive a fair hearing and requires the reversal of his convictions. The State responds that this issue is waived because the defendant fails to cite to any legal authority to support his contention. We agree with the State. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). The defendant is not entitled to relief as to this issue.

## III. Conclusion

Based on the aforementioned reasons, we affirm the judgments of the trial court.


_____
JOHN EVERETT WILLIAMS, JUDGE

14