IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 16, 2016 at Knoxville

## STATE OF TENNESSEE v. PHILEMON ALEXANDER

**Appeal from the Criminal Court for Shelby County**
**No. 14-04754      Chris Craft, Judge**

---

**No. W2015-02494-CCA-R3-CD  -  Filed September 28, 2016**

---

The Defendant, Philemon Alexander, was convicted of one count of theft of property valued at $1,000 or more but less than $10,000.  See Tenn. Code Ann. § 39-14-103.  In this appeal as of right, the Defendant contends that the evidence was insufficient to sustain his conviction, arguing that there was no proof of his possession of the stolen vehicle.  Following our review, the judgment is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Stephen C. Bush, District Public Defender; Barry W. Kuhn (on appeal) and William Johnson (at trial), Assistant Public Defenders, Memphis, Tennessee, for the appellant, Philemon Alexander.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Christopher J. Lareau, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND

The theft charge arose after the Defendant posed as a potential customer at the I-Finance-Auto dealership, asked to test drive a red Mustang convertible, and then drove away and never returned the vehicle.  The vehicle's identification number (VIN) was

-1-

1FAFP4441YF207067. The owner testified that the car had a GPS device, but it was turned off within an hour. The Defendant then sold the vehicle to Ethan Wilkins (Mr. Wilkins). The Defendant met with Mr. Wilkins, Mr. Wiklins' girlfriend, Mr. Wilkins' brother, and Mr. Wilkins' sister. The Defendant gave Mr. Wilkins a false name and bill of sale and told him to present the document at the Department of Motor Vehicles (DMV) to receive the title to the vehicle. After purchasing the vehicle from the Defendant, Mr. Wilkins drove away in the car with his girlfriend and brother, and law enforcement officers stopped him because the car had no license plate. The police then checked the car's VIN number and found it matched the VIN number of the car stolen the previous day from the I-Finance-Auto dealership. The officers arrested Mr. Wilkins, his girlfriend, and his brother. After giving a statement to the police and revealing the name of the man who sold him the car, Mr. Wilkins and his companions were released. In his statement, Mr. Wilkins named Eric Harris as the individual who sold him the car.

Two days after his release, the police compiled a photograph lineup, which included a photo of a man named Eric Harris, but neither Mr. Wilkins, nor his girlfriend, nor sister recognized anyone in the photo. A few days after that, the police processed the bill of sale given to Mr. Wilkins when he purchased the vehicle and found that fingerprints on the document matched the fingerprints of the Defendant. Police then arranged a second photo linup, which included a photo of the Defendant. Mr. Wiklins, his girlfriend, and his sister each identified the Defendant as the indivudal who sold Mr. Wilkins the car.

On September 25, 2014, the Shelby County Grand Jury charged the Defendant with one count of theft of property valued at $1,000 or more but less than $10,000. See Tenn. Code Ann. § 39-14-103. A trial was held in the Criminal Court for Shelby County on September 15 and 16, 2015.

At the Defendant's trial, the State offered the following evidence. The State first presented the testimony of Michael Coburn (Mr. Coburn), a crime scene investigator with the Memphis Police Department (MPD). Mr. Coburn testified that he examined the bill of sale the Defendant gave to Mr. Wilkins by soaking the document in a chemical that turned the document purple. Mr. Coburn explained he found ridge detail on the document after this chemical process, and as a result, he sent the document to the latent print examiners in the MPD for further examination. The State entered the bill of sale as an exhibit and marked it for identification purposes.

The State then called Kyle Sledd (Mr. Sledd) to testify. Mr. Sledd explained that he worked in the car business and was a part owner of the I-Finance-Auto dealership. He testified that on February 17, 2014, a man stole a red Mustang convertible valued at $6,999. Mr. Sledd then viewed and identified the title to that Mustang, which was then

entered into evidence. He further testified that the title indicated the VIN number for the stolen car was 1FAFP4441YF207067. Also, he said that he did not give the man who took the vehicle permission to take the vehicle and not return it to the car dealership.

During cross-examination, Mr. Sledd admitted that he did not have personal knowledge of the identity of the man who drove off with and failed to return the Mustang. He explained that the car dealership attempted to track this person by using the GPS system installed in the car, but the GPS system "was cut off within an hour" after the vehicle was taken from the dealership.

The State then called Mr. Wilkins to testify. Mr. Wilkins stated that his girlfriend saw an advertisement on Craigslist for a red Mustang convertible, for $2,500. Mr. Wilkins then contacted the man who posted the advertisement and set up a meeting to test drive and potentially purchase the vehicle. Mr. Wilkins said he, his girlfriend, his brother, and his sister met with the Defendant at the specified time and place in Memphis, Tennessee. After test driving the vehicle, Mr. Wilkins gave the Defendant $2,500 in cash to purchase the vehicle. The Defendant gave Mr. Wilkins a bill of sale and instructed Mr. Wilkins to sign it and "take [it] downtown" to receive the title to the vehicle. Counsel for the State showed Mr. Wilkins the exhibit of the previously identified bill of sale, and Mr. Wilkins identified this document as the document he signed and received when he purchased the Mustang from the Defendant.

Mr. Wilkins further stated that he believed the car sale to be a legal transaction. According to Mr. Wilkins, the inside of the car was not damaged in any way, and he acknowledged that "the steering column didn't look like it had been jimmied with." He indicated that the transaction was completed in about thirty minutes and said, "We [meaning the Defendant and Mr. Wilkins] interacted, we were face to face talking, communicating about the car, he was telling me about it. I went to the gas station [to withdraw cash] and came back and that was it, we exchanged." Mr. Wilkins then stated that he had never purchased a car before this encounter, and he believed he got "swindled."

Mr. Wilkins testified that after purchasing the car, he drove it to a gas station and filled the gas tank. About five minutes after leaving the gas station, police officers pulled him over for failing to have a license plate on the Mustang. Mr. Wilkins stated that his girlfriend and brother were in the car with him when the officers stopped them. Mr. Wilkins gave the officer the bill of sale, but they were each arrested and taken to the police station. At the station, Mr. Wilkins gave a statement to the police and identified Eric Harris as the name of the individual who sold him the Mustang. Upon giving this statement, Mr. Wilkins and his companions were released from police custody.

Mr. Wilkins returned a few days later to the police station to view a photo lineup. However, Mr. Wilkins was unable to identify anyone in the lineup. A few days after this initial photo lineup, Mr. Wilkins returned to the police station to view a second photo lineup. After viewing the photographs, Mr. Wilkins identified the Defendant as the individual who sold him the Mustang. Counsel for the State then presented the Defendant a document titled, "Advice to Witness Viewing Photographic Display." Mr. Wilkins confirmed that he read this document before viewing the photos in the lineup and said he understood the document was instructing him to be "100% sure, not guessing" when identifying an individual. This document was then entered into evidence.

The State then showed Mr. Wilkins a document, which he identified as a copy of the photo lineup in which Mr. Wilkins identified the Defendant. On the document, Mr. Wilkins had circled a photo of the Defendant and had written, "This is the man that gave me the bill of sale." This document was also entered into evidence. Mr. Wilkins then stated the individual who sold him the Mustang and gave him the bill of sale was present in the courtroom and indicated that individual was the Defendant.

On cross-examination, Mr. Wilkins explained that he contacted the Defendant after his girlfriend read the advertisement for the Mustang on Craigslist. Mr. Wilkins and the Defendant set up a time and location to "meet to look at the vehicle." At the meeting, Mr. Wilkins took the car for a test drive and discussed the price with the Defendant. The Defendant assured him it was a fair purchase price. Mr. Wilkins inquired about the title to the car, and the Defendant told him he needed to take the bill of sale "to the title place" and then he would receive the title. Mr. Wilkins further explained this was his first time buying a car, and he believed receiving the bill of sale was sufficient.

Counsel for the Defendant then asked Mr. Wilkins about the lineup in which he identified the Defendant as the man who sold him the car. Mr. Wilkins stated that the man who sold him the vehicle "had a tear drop on his face." Then counsel asked Mr. Wilkins about the description of the man who sold him the car that he initially gave to the police. Mr. Wilkins viewed his previous statement and read, "He's a black male, weighed about 180 lbs., he's about six feet tall, tattoos on his arm, right side of his face, that's all I can remember." Mr. Wilkins admitted it was dark the evening he purchased the vehicle, but he asserted, "They had street lights, it was lights, it wasn't that dark where I couldn't remember his face."

Then, the State called Latabitha Wilkins (Ms. Wilkins), Mr. Wilkins's sister, to testify about the transaction between the Defendant and her brother. When asked to describe what happened at the meeting with the Defendant to purchase the vehicle, she said, "We got there, we test drove [the Mustang], we liked what we saw and we went and got the money, we came back and we paid him. He gave us a piece of paper, a bill of

sale, supposed to been, and he left." She also stated that Mr. Wilkins inquired about the title of the car and that the Defendant instructed him to take the bill of sale to the DMV to obtain the tags and registration for the vehicle. After Mr. Wilkins purchased the Mustang, she drove away in her own vehicle.

A few days later, the police contacted Ms. Wilkins and asked her to come to the police station to view a photo lineup. Counsel for the State showed Ms. Wilkins a document, which she identified as the photo lineup document she had signed. Additionally, she had written on the document, "This is the man that sold my brother the car." This document was marked as an exhibit and entered into evidence. Furthermore, when asked if the man who sold her brother the car was present in the courtroom, she identified the Defendant. Counsel for the State then asked her if there was "any doubt in your mind that's the individual that sold your brother the car?" to which she responded, "No."

On cross examination, Ms. Wilkins explained that she was simply involved in the transaction to provide transportation to the meeting to get the car. She said when they arrived at the meeting location, she asked the Defendant the price of the car. Ms. Wilkins stated that after conversing with the Defendant "for a couple of minutes," she noticed teardrop tattoos under one eye. She admitted, "I can't remember which eye, but I saw teardrops under his eye." Also, Ms. Wilkins stated that after test driving the car, she took her brother to a gas station so that he could get cash from an ATM machine to purchase the vehicle. She heard her brother ask the Defendant about the title to the car and admitted she had never "heard of any transaction such as that before." Ms. Wilkins continued to explain that she did not find anything amiss about this because she had never "bought a car from no one, [she had] always gone to the car lot."

After Ms. Wilkins's testimony, the State called Johanna Yang (Ms. Yang) to testify. She stated that she was Mr. Wilkins's girlfriend and that she was with him when he purchased the Mustang from the Defendant. She explained that when they first arrived at the meeting place, they inspected the car and discussed its condition with the Defendant to make sure "the car was running and was in good condition." They also took the car for a test drive. Then they left to get some cash, returned, and Mr. Wilkins paid the Defendant for the car. When asked if the individual who sold Mr. Wilkins the vehicle was present in the courtroom, the court noted that Ms. Yang "pointed at the [D]efendant and described his clothes," and she testified that there was no doubt in her mind he was the individual who sold her boyfriend the vehicle.

Ms. Yang further testified that she was arrested along with Mr. Wilkins. After driving away in the recently purchased Mustang, the police stopped their vehicle. Following their arrest, the police took them to the police station where she explained that

her boyfriend had purchased the car and had a bill of sale. She stated the seller identified himself as Eric Harris. A few days later, she returned to the police station to review a photo lineup, but she "didn't recognize any of the faces." Ms. Yang later returned to the police station to view a second photo lineup. She recognized the man who sold her brother the car in the lineup and circled a photo of the Defendant. She explained one of the "things that helped [her] remember his face" was the "tear drop" tattoos on his face. She then identified the Defendant in the courtroom as the man who sold the car.

On cross-examination, counsel for the Defendant asked Ms. Yang questions regarding the photo lineup in which she identified the Defendant as the man who sold her boyfriend the vehicle. She testified that she was able to identify the Defendant in the lineup and that the tattoo on his face "helped [her] to remember his face." Counsel asked if she had spoken to the Defendant about the title to the car, and she replied, "We had asked and he had said that his license had a fine and that if we just took down the bill of sale we would be able to get the title." Ms. Yang indicated she had never purchased a vehicle prior to this incident, and she "didn't know how [a car sale] was supposed to go." Ms. Yang further indicated the meeting took place at night, and when asked how close she was to the Defendant, she said, "I was pretty close, I had noticed that he had tattoos on his face, so I mean, we had looked under the hood [of the car], next to each other, so that's pretty close."

Following Ms. Yang's testimony, the State requested that the Defendant "stand and approach the jury" so that they could see his face. The Defendant then stood before the jury so that the jurors could see "the two tear drops under his left eye."

Ned Aufdenkamp (Officer Aufdenkamp), an officer for the MPD, testified that he was involved in a traffic stop with a red Mustang on February 18, 2014. He stated that his partner originally pulled the car over, and he and one other police officer went to the scene to assist. There were three occupants in the car, two males and one female. He then explained that his partner "ran the VIN and it came back stolen." Then the officers "detained all of the occupants, put them in custody and that [was] when the driver was saying that they had just purchased the vehicle and they bought it on Craigslist and they had a bill of sale." The officers took the three occupants to the police station, and Officer Aufdenkamp said he took the bill of sale, tagged it, and placed it in the property and evidence room at the MPD.

On cross-examination, Officer Aufdenkamp reiterated that he arrived at the scene after the initial traffic stop to assist his partner. He said that once he arrived at the scene, he and another officer "assisted on identifying the people in the car, [they] separated them and then, you know, transporting them, also." He explained that once the officers realized the car was stolen, they arrested the individuals in the car, who then told the

-6-

officers they had purchased the vehicle recently and the bill of sale was located inside the car. Officer Aufdenkamp testified that he believed he was the officer who retrieved the bill of sale from the car. He explained he tagged the document into evidence and turned it in to "property and evidence" at the MPD. At that point, he explained that he had nothing more to do with processing the bill of sale.

The State then called Sergeant Lambert Chatman (Sergeant Chatman), who testified he was an investigator for the MPD. When asked about his daily duties, he explained he "investigate[d] cases from anywhere from assaults, robberies, burglaries, auto-thefts and any assault cases." He then stated that he was specifically assigned to investigate the case against the Defendant. When he was assigned the case on February 20, 2014, he had three suspects: Mr. Wilkins, Ms. Wilkins, and Ms. Lang. After reviewing the case, an individual named Ed Harris became another possible suspect. To further investigate this individual, Sergeant Chatman did research to find photos of Eric Harris and created a photo lineup using this man's photo. However, none of the three original suspects recognized this man. He then explained that the bill of sale was processed by a latent prints examiner, and the results came back with fingerprints on the document matching those of the Defendant. Then, Sergeant Chatman created a second photo lineup, which included a photo of the Defendant. He showed this photo lineup to Mr. Wilkins, Ms. Wilkins, and Ms. Yang, and they each identified the Defendant as the individual who sold Mr. Wilkins the Mustang.

On cross-examination, counsel for the Defendant asked additional questions regarding Sergeant Chatman's investigation. Sergeant Chatman explained that he began by reviewing information in the file, including the police report for the incident he was investigating. He explained that he found a driver's license number for Eric Harris from the Hernando Police Department. He then used this information to obtain a photo of Eric Harris and created a photo lineup including this photo. After no one was able to identify anyone in this first photo lineup, Sergeant Chatman "retrieved the bill of sale." He explained he retrieved the document from the property room and took it straight to the latent print examiner, "[s]o the chain of custody [was] never broken." Once the latent print examiner has examined the document "to see if there [were] any prints of value," Sergeant Chatman received "a notification by e-mail that the prints c[a]me back to [match] someone and they [would] take the evidence back in the property room." This notification only indicated prints that were positively identified.

Larry Preston (Mr. Preston) was the final witness to testify for the State. Mr. Preston stated that he worked in for the MPD as a latent prints examiner. He explained that a latent prints examiner "examines fingerprints, or latent prints that were lifted from objects. It could be a vehicle, or window, but we examine the prints to determine if they are of quality identification. And if so, we attempt to identify that print, to a certain

individual." Mr. Preston stated that he had specialized training to be a latent print examiner at the Federal Bureau of Investigation in Washington, D.C. He participated in a "new fingerprint examiner's class, which consisted of a twelve week class and [he] was employed there for approximately nine years, where he learned [his] trade on the job." Additionally, Mr. Preston attended a three-week latent print course in Quantico, Virginia, which "consist[ed] of classifying, [c]ourt testimonies and things of that, concerning latent prints." When asked how many prints he had inspected throughout his career, he replied "into the millions," and added he had been examining latent prints for "forty-one years." The court then qualified Mr. Preston as an expert witness in "fingerprint identification."

Mr. Preston then gave testimony concerning this case. Counsel for the State showed Mr. Preston exhibit one, the bill of sale. Mr. Preston identified the document as the document he examined for latent prints. He testified that he identified "thirteen different prints" on this document. To identify the prints, Mr. Preston explained that he ran the prints through the "automated fingerprint identification system," which searched a database and provided "suspects that [he] c[ould] actually go in and do a visual examination and make an identification with." Mr. Preston matched these prints to two different individuals: Officer Brett Kugler (Officer Kugler) and the Defendant. He stated three prints belonged to Officer Kugler, and ten belonged to the Defendant.

On cross-examination, Mr. Preston indicated that there were four prints of value on the Mustang that were unidentified. Mr. Preston stated, "We attempt to identify all of the prints that are of value as far as identification." However, after running all of the prints of value through the database, these four prints of value remained unidentified. Mr. Preston said that the database they used for print identification purposes contained approximately half a million fingerprints gathered from Shelby County.

After consulting with his lawyer, the Defendant chose not to testify in his own defense.

At the conclusion of the trial, the jury convicted the Defendant as charged. The court ordered the Defendant to serve an eight year sentence with the Tennessee Department of Correction. The Defendant filed a motion for a new trial on October 7, 2015, in which he challenged the sufficiency of the evidence supporting his conviction. The court denied this motion on December 3, 2015, and the Defendant filed a timely notice of appeal. The case is now before us for our review.

ANALYSIS

The Defendant contends the evidence was insufficient to sustain his conviction of theft of property valued at $1,000 or more but less than $10,000. See Tenn. Code Ann. § 39-14-103. Specifically, the Defendant argues there is no proof offered to demonstrate how the Defendant came into possession of the stolen vehicle. Thus, the Defendant argues the evidence does not support his conviction. The State responds that the evidence is sufficient.

An appellate court's standard of review when the Defendant questions the sufficieny of the evidence on appeal is "whether, in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id., State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

"A person commits theft of property if, with the intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103. Theft "may be committed generically in essentially one or two ways: (1) taking or obtaining property, or (2) merely exercising control over the property, all without the owner's consent and with the requisite intent to deprive." See State v. March, 293 S.W.3d 576, 592 (Tenn. Crim. App. 2008).

At trial, three witnesses positively identified the Defendant as the man who sold Mr. Wilkins the stolen Mustang. Fingerprints matching those of the Defendant were found on the bill of sale given to Mr. Wilkins after he purchased the vehicle. The Mustang was valued at $6,999, yet Mr. Wilkins purchased the vehicle for $2,500. Additionally, the VIN number on the Mustang Mr. Wilkins purchased matched the VIN number from the Mustang stolen from the I-Finance-Auto dealership the previous day. The Defendant insists there is no proof that indicated he was the individual who drove the Mustang from the car lot. However, the jury would have been able to infer that the Defendant had stolen the vehicle based on his possenssion of the vehicle the day after it

was stolen. See State v James, 315 S.W.3d 440, 450 (Tenn. 2010) (stating that possession of recently stolen property, unless satisfactorily explained, creates a permissible inference that the defendant gained possession through theft or had knowledge that the property had been stolen). Furthermore, it is in the province of the jury, not this court, to resolve any conflicts in the evidence.

Additionally, there is evidence that the Defendant exercised control over the vehicle without the owner's consent. The Defendant had possession of the vehicle, placed an advertisement on Craigslist for the vehicle, and then sold the vehicle to Mr. Wilkins. The I-Finance-Auto dealership had reported the vehicle stolen the day before the Defendant sold the vehicle, and Mr. Sledd testified that "whoever took that car" did not have permission to take the vehicle and not return it to the car dealership. Thus, the Defendant exercised control over the vehicle, he did not have the owner's consent, and the Defendant clearly intended to deprive the dealership of the property by selling the vehicle to Mr. Wilkins. Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's conviction for theft of property.

CONCLUSION

Based upon the foregoing, the judgment of the trial court is affirmed.

_____

D. KELLY THOMAS, JR., JUDGE